**FILED**

FEB - 5 2007

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Dr. Geoffrey R. Akers, P.E. Plaintiff
25 Lincoln Avenue
Norwich,Connecticut 06360
860-889-7860

    v.

Carlos Gutierrez, Secretary Of Commerce
Patricia Boylan, Director OCR/US Patent Office
600 Delany Street Room 7D07 East
Alexandria, Virginia 22314
571-272-8095

CASE NUMBER   1:07CV00266   **JURY ACTION**

JUDGE: Richard J. Leon

DECK TYPE: Employment Discrimination

DATE STAMP: 02/⬤/2007

## COMPLAINT

This complaint is filed against the United States Patent and Trademark Office in the

Department of Commerce for age discrimination(2) and retaliation(1) against the Plaintiff

under 29 CFR 1614-401,405(b),407, 409(et seq) & Title VII Civil Rights Act(1964)(42

USC 2000 et seq), Sect 15(d) of Age Discrimination Act of 1967,29 USC 633, Fair Labor

Standards Act 29 USC 201, Pullman-Standard v Swint(456 US 273,293(1982),Chandler

v Rudebard (425 US 840(1976), Hilliard (659 F2d 1125 DC Cir 1981) .

A trial by jury is expressly requested in this case. Monetary damages in the statutory sum

of  $300,000 against a government agency are sought(compensatory damages) plus

punitive damages in the sum of $10,000,000 are additionally sought. Reinstatement at the

GS-15 level at the US Patent Office is also requested with back pay and interest

calculated from August,2004 to the date of award. Akers had already requested

compensatory and punitive damages on the initial 11/26/04 EEO  Complaint filed with

US Patent Office which are being realized at this time.

*1*

-2-

## FACTS

In June, 2004, Plaintiff was employed at the US Patent and Trademark Office as a GS-14(Series 1224) Primary Patent Examiner holding a USPTO Master's Certification in the technological art. Plaintiff applied for a position as a Supervisory Patent Examiner(GS- in Technology Center 3600(TC 3600)under Vacancy Announcement PTO-04-078(attached as Exhibit A). Akers was not selected for the position and a less qualified Asian female with education and experience not matching the vacancy Announcement requirements, was. Akers had a history of being on the GS-15 short list at USPTO (shortlisted in TC3700 and TC2600) earlier that year and had also been on the GS-15 shortlists of ITA, Census,NOAA(for a total of 10 other shortlists plus the two on USPTO, when he had just become eligible for GS-15 in June,2004.).

l) Retaliatory Component:

In August,2004, Plaintiff filed an EEO complaint with the EEO office at USPTO as a result of this non-selection based on age and race(American Indian)(which he has simply elected to not pursue at this time, but may in the future). In the initialization of retaliation, almost concurrently following the complaint, Akers began being bothered by "conflict of interest" cases, surprisingly being addressed(a total of 6).

Earlier in the year, effective March 31,2004 Akers had been reassigned to another Art Unit (3625)by Vincent Millin, SPE of 3625 and 3624, because a certain class/subclass of cases(705/38-45) provided only the "appearance" of a conflict(not in reality). Akers' docket was divided by SPE Millin and the remaining docket Akers worked on, following Millin's division. (In the USPTO, the SPE job functions are to manage the dockets of

-3-

examiners as part of the official job description, so that the docket management was
Millin's responsibility, not Akers').

Akers was escorted in October 2004, following filing of the EEO complaint, to an
"interview"(unannounced and unplanned) by Millin with an employee representative,

Anne Mendez who asked Akers about the 6 cases. Akers, in the presence of Atty Vinh
Luong(POPA lawyer) pointed out that in none of the cases, there was no conflict, as he
had no financial interest in any of the companies which were parties to the applications
and that further one of the cases was an "implied abandonment" as stated by Atty Vinh
Luong. That meeting resulted in non-conclusive results.

Again on November18, 2004 another surprise and unannounced meeting was held with
Anne Mendez, Millin, Kit Cooper, John Love(Director). The very same questions were
again asked in the pattern of an inquisition to try to badger the Plaintiff into a false
confession. That second meeting resulted in no conclusion also, as stated by John Love
afterwards to Vinh Luong and Akers together "We don't have a case yet".

As a result of being badgered, harassed and having a hostile work environment created
by these named people, Akers in disgust resigned(not voluntarily) but under coercion of
the hostile environment and unpleasant working conditions created by these people and
this conditions by repeated inquisition and badgering and in disgust for the lack of
appreciation exhibited by USPTO personnel for his five years of meritorious work at the
USPTO. It is noted that in five years at USPTO, Akers received three annual outstanding
ratings and two annual satisfactory ratings with cash bonuses for performance each year.
In Akers' final year, Millin had initially indicated to Plaintiff in May,2004, that Akers

-4-

would receive an outstanding but later changed the rating to satisfactory despite the fact that Akers had performed at an outstanding level(132% production under POPA labor union agreements with the USPTO).

Upon retiring from the USPTO on January 5,2005, Akers applied for his agent registration number with the Office of Enrollment and Discipline at the USPTO, having met all requirements to receive the registration under the published guidelines. In June, 2005, OED began questioning Akers on the same remaining 3 cases(a subset of the original 6) for which the Director Love had earlier said in November 2004, USPTO had no case yet—apparently trying to construct a false claim against Akers. Akers answered these questions, the number of cases then decreased to 2 and a second set of questions was posited in August,2005. After answering these questions, a third set of questions on only remaining 2 cases was set in March,2006, and OED Director Harry Moatz proposed as deal to Akers—if he would "confess" to false charges, the registration umber would be expedited. Akers refused to confess to false charges(in wrongful accusation) and Moatz has suspended all communication with Akers following Akers' response to the Show Cause Requirement(See Exhibit A) . The registration number application is still in abeyance. Of the two remaining cases, one is an expressed abandonment, as written by the attorney-applicant for the file and followed up reasonably by Akers several times with applicant's attorney's offices. The second was a case that had its final prosecution completed on March 9,2004 PRIOR to the March 31,2004 transition date from the old art unit(3624) to the new art unit(3625) and which final prosecution was excluded from the erroneous requirement anyway(since Akers had no financial interest in any of the

-5-

companies applying for the patents under the Exemptions in the USPTO Ethics Rules 2002(Exhibit B). Furthermore, the attorney for the applicant(Christopher Devries tele=313-665-4969) for the final case 09/816905 confirmed that Akers had no deal with the applicant to allow the cases and had no financial interest in the project. Thus, under the badgering that the Office of Enrollment and Discipline and the TC 3600 coercive attempts to make deals with Akers to confess to a false accusation, the pain and suffering and the loss of income for withholding the registration number, Akers is seeking retaliatory remedies.

 Millin knew of Akers' outside financial model development and advising as far back as 2002 and recommended that Akers place this material(advanced securities licenses, research) into his application for USPTO Master's Certification which he received in June 2002 almost three years earlier. Since there was no problem then and suddenly there was harassment immediately following the filing of the EEOC claim in August, 2004, circumstantial evidence is amassed to link the EEO claim with the badgering to eliminate Akers from the USPTO and end the "problem" of an EEO claim filed at USPTO against an otherwise unqualified applicant who did not meet the job description requirements. This is retaliatory action against a complainant who it has been now shown has a prima facie case for age discrimination as admitted by USPTO/OCR and affirmed by EEOC.

  However, USPTO admitted that Akers in fact did have a prima facie EEO case for age discrimination against the agency, and it devolved upon the Agency to show that appointing a less qualified applicant served a legitimate governmental purpose and was believable. EEOC concurred that Akers has a prima facie case of age discrimination in

-6-

October, 2006 and again in December, 2006. EEOC only said that the appointment of

such an individual was believable. It now will be shown that this statement is in error,

and that Plaintiff has recourse to reinstatement in the federal service at the GS-15 level

with back pay and interest from August,2004 forward.

2) EEO Claim Component:

Initially, the Agency failed to conduct an investigation of the EEO complaint within the

180 day investigation period and had to enlist the services of an outside firm to do so in

June, 2005.Agency further failed to timely file its response of its Agency Final decision

within the 40 days including any 5 day extension, under MD-110 EEOC Sect

1614.404,402 Chapter 9-(II)-A-1-b(2) as cited in the record and as filed on 5/15/06(see

Exhibit D) attached. The agency's response was filed 5/22/06 in response to the EEOC

Judge's remand of the case to Agency for a decision of March 29,2006, and was filed out

of time. Agency filed its response to Akers request for consideration on December

26,2006 by US postmark date, outside the time response period for Agency's answer to

Plaintiff's requests. Agency has a patterned history as indicated in the record of failing to

comply with procedure and timelines in the prosecution of this case which continues to

the present.

  In November, 2004, Akers filed a complaint to include reinstatement at GS-15 at the US

Patent Office with back pay from August,2004 and interest and asserted retaliation as an

additional claim(see ROI file). Claimant originally filed a claim based on age and race

discrimination as a Cherokee Indian, but elected to defer the Cherokee Indian claim until

a registration number is obtained. Claimant however, reasserted his racial claim on the

-7-

basis of being white when an Asian was appointed to the position that does not meet the qualifications of the job description.

Agency has already admitted that the Claimant has a prima facie case for age discrimination(which is augmented herein to include racial discrimination on being white). EEOC has adopted this position and included it in its final decision of December 8, affirming its decision of October 19,2006. EEOC thus has entered in its final decision that a prima facie case exists for discrimination at the USPTO herein.

In accordance with the cases BODINE(450 US 256), LOEB(600 F 2d 1003,1012, n6(1st Cir. 1979), MCDONNELL DOUGLAS, St. MARY'S HONOR CENTER V. HICKS 509 US 502, 519(1993), REEVES(120 S. Ct 2097, 6/12/2000) the following material supports that management action's have no credibility and thus the reasons filed on 5/22/06 by the USPTO are pretextural and not believable.

The Vacancy Announcement(PTO-04-078) in this case required that the incumbent have knowledge and background in physics, nuclear engineering and chemistry. The vacancy Announcement further required that the incumbent be able to secure a US security clearance and that the incumbent have prior experience as a manager. The incumbent as also to be the Director's representative at meetings that would involve knowledge of the US Atomic Energy Act and that the incumbent was to make ethical judgments on US patent applications that involved physics and nuclear engineering. The complainant applied for this position having a PHD in physics, an MS in nuclear engineering and a second minor in chemistry—identical with the job description. The complainant also had

-8-

been a manager in industry for at least 15 years earlier including being Deputy Director of Systems Engineering at E-Systems/Raytheon, Director of Advanced Development at General Instrument, Test Director at ALCOR C-band tracking radar at the Pacific Missile Test Range(RCA-General Electric) all indicated on his attached CV. Furthermore, the plaintiff has an MBA in finance and management and a certificate in Advanced Business Management from Georgetown as indicated on the attached CV to his application package as submitted to the rating review panel.

The selectee, an Asian female, had none of these qualifications and none of these credentials and virtually no prior management experience. Furthermore, as a Asian, there is some concern even over her ability to obtain a security clearance as required by the Vacancy Announcement because of access to sensitive US nuclear industry information and patents and provisions of the Atomic Energy Act. The plaintiff has a current security clearance now and has held security clearances for over 25 years in the high technology defense industry. The selectee had, as of the time of application, only a BS in mechanical engineering, and was not a licensed professional engineer as is the plaintiff in any discipline. Additionally, she had computer skills as delineated in her application, but not particular relevant to the position requirements as officially advertised to the public by USPTO(US Patent Office).

The rating accorded the plaintiff herein as a member of TC3600 for this position is the sole anomalous rating as received by him in previous and current applications for GS-15 positions. Plaintiff was placed on the short list at NOAA, Census, ITA,EPA and in TC2600 and TC3700 for GS-15 SPE positions as highly qualified. The present rating is

-9-

inconsistent with universal treatment and rating accorded him by outside agencies in addition to the USPTO itself(other technology centers(TC). Akers further missed the short list here by only one position(rated 6th on a short list of 5) with all these militating factors ignored which are also erroneous to begin with.

As addressed in previous arguments with the USPTO and further addressed here, the Rating matrix as addressed by Akers, from which were derived the applicants referred to the selecting official, Donald Hajec of TC3600 was fraught with errors and inconsistencies. Thus, the very process followed was not even believable because of its internal contradictions delineated herein.

Direct correlation of KSA's and credentials with the elements of the Crediting Plan yields a direct correction of Complainant's assigned score of +22 to +25 points where Akers received 48. This rating was coincidentally right below the arbitrary cutoff of 55, which was artificially low and not representative of his credentials, education, and professional experience. This correction would have placed Akers at the very top of the rated employees above everyone else also for having received a corrected score of 70-73.

It is set that to demonstrate redressable discrimination, an agency action does not need to have a discriminatory intent, but only a discriminatory effect.(US Sup Ct-March 2005-Illinois Policemen's Organization).In the present case, EEOC has already found a prima facie case for discrimination; a discriminatory effect occurred in denying the oldest, most qualified applicant the position, when a member not of the protected group was selected with less qualifications vis a vis the USPTO Vacancy Announcement as delineated to the

-10-

public and the elements in the Crediting Plan. No other applicant had a PHD in

physics(required by Vacancy Announcement in writing); no other applicant had an MS

degree in nuclear engineering(required by Vacancy Announcement in writing); no other

applicant was a licensed engineer; Akers further had an MBA and a Certificate in

Advanced Business Management and the resume was indeed attached to his resume. The

statement made by Mr. Will is erroneous that this record was not before the SPEs as it

was a composite placed before the panel for review. No other applicant had as many

years in management in industry as Akers; Akers had also been an acting-SPE and held a

USPTO Master's Certification, which few applicants have. Furthermore, Akers was the

oldest applicant and white. Even the USPTO in its Agency Decision of May 2006

admitted that the selectee Ms Luu had "some" management experience but not much, and

certainly not 15 years as Akers did because she had not been even working that long in

her entire career which consisted of being a contractor with computer personnel before

entering USPTO. Also, viewing even the selectee's limited experience, one sees that she

has no budgetary, financial management, hiring, firing authority, marketing, program

management experience, but merely watched over some coworkers as a contractor

support role. Her experience is in computer applications and certainly not in nuclear

physics  or physics. Applying unequal treatment to Akers by being overly harsh on the

excessive delineation of his management experience over 20 years and attempting to

broadly ignore the attached resume and not applying the same treatment to Ms. Luu

reveals unevenness in agency policy and supports the incredibility of the reasons posited

by SPEs or fairness of the rating panel members.

-11-

The panel did not provide documented or substantiated reasons for the ratings they gave
Akers as evidenced by their lack of working papers, methods of derivation of scores,
failure to maintain records in this personnel action. Such deficiency alone in itself is
actionable and potentially violates Office of Personnel Management guidelines for lack
of adequate management of personnel records. The scores are just hearsay as they are not
substantiated. Merely saying a score of X is appropriate with no supporting rationale is
tantamount to a teacher in school telling a student he receives a score of 77 as
"appropriate" with no correction marks on his paper. There was no evidence of any
underlying or deriving methodology or that this methodology was even consistently
applied to different applicants. Furthermore such an approach leaves the panel room for
abusiveness in assuring fairness as USPTO later admitted that a prima facie case for
discrimination does exist and EEOC has affirmed in 2006.This action no only lacks
credibility, it is a mockery of common sense.

The SPEs excessive reliance on Mr. Will's responses suggests that Mr. Will wrote the
response and Ms. Mai and Mr. Carone simply colluded on a group response, destroying
any suggestion of independent analysis, impartial reasoning or treatment and suggesting a
completely biased defense on credibility—such activity leads to the conclusion that
further evidence of lack of fairness existed further eroding the believability defense
proferred by USPTO as the final line of defense against agency liability for support of
remedies and damages. In a prior argument Akers presented a simple mathematical
argument that demonstrated that it was almost impossible for the three SPEs not to have

-12-

conspired. The probability that the words on three pages by three people are all identical (as responded by the SPEs in the record)is roughly 1/200000000 which essentially assures collusion. USPTO/OCR essentially agreed with Akers in its Agency Decision response footnote-page 7—"Although it is not clear what may have caused this UNUSUAL circumstance..." Even interviewing as a group the responses are those of a single person everyone sitting in a group does not give identical answers as everyone else—this implies the responses are not independent, therefore colluded and conspired and therefore not credible—this element alone destroys the credibility of the Agency.

It is further noted that all three SPEs in this rating panel were under 40 when they were appointed SPEs based on statements made by them in the ROI. Assuming that the ages of examiners are approximately 25-65, the median age is 45 at the USPTO. For under 40 and a normal distribution of the population, less than ½ are below 40. So the probability of appointing three SPEs all under 40 at time of appointment and that they serve on the same panel(herein) is <u>less</u> than (1/2)(1/2)(1/2)=.125=1/8. This means that the age composition of the panel as assembled demonstrates a past history of USPTO that more likely than not was to appoint under 40 year olds and that age discrimination most likely was practiced in the past, and that the present case is just another statistic in a history of age discrimination practiced by the Agency. It further indicates a tendency of the SPEs to think of under 40 year old candidates in their own perspectives. This was borne out in selecting the youngest member of the applicants and excluding two white males in their 50's and not selecting another white male with a PHD in mechanical engineering which

-13-

contradicts another of the SPEs  statements that a mechanical engineer can do a nuclear engineer's work which is internally inconsistent.

Even further, the educational and professional backgrounds of the SPEs are entirely unrelated to the qualifications required of the position and places them in a difficult if not impossible position of evaluation of candidates in a body of science(physics/nuclear engineering/chemistry) outside of their own respective fields of study. Mr. Will at this time was a SPE in harvesters and earth excavators; Ms Mai a SPE in ladders; Mr. Carone a SPE in explosives and firearms. None have  an earned doctorate in any discipline. It is further noted that in March 2004, Akers spoke with Mr. Carone about doing some nuclear cases with a retiring expert examiner for Mr. Carone's art unit and that Mr. Carone told Plaintiff that Akers could teach Mr. Carone about nuclear physics and nuclear engineering-an open acknowledgement to complainant that Mr. Carone, one of the SPEs on the rating panel felt plaintiff was qualified to perform this work in the art unit and knowledge of which was required in the published Agency Vacancy Announcement cited earlier.

Addressing the Rating Matrix and its correlation against the vacancy Announcement and the Crediting Plan, it is noted that the essential elements in the Crediting Plan to demonstrate competence(see ROI) are degrees, licenses, publications, per recognition in the field, organizational activity, professional and management and leadership skills and communication skills including USPTO credentials(Master's ratings, awards).The numerous inconsistencies between the statements made by the SPEs and the elements

-14-

presented in the resume and KSA's and Vacancy Announcement and Crediting Plan are investigated. For the sale of conciseness, Akers agrees with all the elements he listed as related by Agency on Akers' qualifications and in his CV as submitted to the rating panel in the application package. Akers further asserts, on the advice of the independent investigator that Ms Mai had a grudge against him from the classroom on the file wrapper that she taught when he was a new examiner at the USPTO. Since Ms Mai does not remember by her testimony, Akers assertion stands as Ms. Mai cannot deny it and it stands asserted that Ms Mai had a grudge and negative bias during the rating process.

Again, since the entire OCR report is based solely on Mr.Will's statements alone it appears that these statements are solely those of Mr. Will—the other panel members do not want to testify and thus the identical statements given to the investigator in the ROI are not independent and thus collaborative and no credibility can be accorded them because they are collusive.

Turning to the individual rebuttals and errors in the Rating Matrix one has the following: Element 1-Ability to Supervise and Perform Administrative Duties including mentoring, Leading and Training Patent Examiners and Other Employees:

ANSWER: Akers had pointed out in his resume that he had been acting-SPE, had managed in corporations up to 50 engineers and scientists as Deputy Director of Systems Engineering at E-Systems and rated and hired engineers as Director of Advanced Development at General Instrument Corporation. He further indicated that he had managed large multimillion dollar programs at E-Systems. The statement that

-15-

complainant's write up was "insufficient in demonstrating evidence of supervising and training as Mr. Will says in the SPE's comments is factually false and that these elements "were not before us" is inconsistent with previous statements where the SPE's reference use of the resume which is where these statements were as the resume was attached to the package that the panel saw. Even OCR cites the resumes of applicants on page 11 of its Agency Decision conceding that the resumes were in fact, and of course they would be, part of all applicant's whole files for review. These statements made by Will(and relied upon by Carone and Mai as they are silent on rebuttal-suggesting collusive activity) demonstrate negligence in performing the duty of reviewing the duty of reviewing complete files and a bias of applying uneven harshness to Complainant's materials that was not applied to Luu's materials as she has no management experience after the fact to try to rationale artificially low scores given to Akers. Even this unequal treatment, in itself a basis for complaint is only able to push Akers' scores down to right below the referred applicants list(6th when 5 were referred to Hajec)(7 points total in 5 areas).Akers further cited he had been an adjunct professor at 7 universities on his resume. A furniture coordinator is inadequate against being an adjunct at seven universities and this statement again indicates uneven treatment in scoring applicant's record and is more unbelievable that coordinating furniture movement is an element that serves the government's interests in nuclear engineering. Membership in professional organizations is an element in the Crediting Plan and was indeed before the panel in the attached resume.Mr. Will's statement that the bullets(and resume) showed no specific supervisory experience is simply wrong. The resume indicates over 20 years of management experience and a

-16-

Certificate of Advanced Business Management from Georgetown as well as an

MBA(was also attached, not by any other applicant). Work experience managing large

military contracts and 50 engineers and scientists and 35 professionals in finance and

administration is simply beyond the ordinary work of a primary examiner as indicated in

the resume. Membership in professional organizations as cited in the Crediting Plan and

membership in Sigma Xi scientific research honor society(equivalent to Phi Beta kappa

in Arts and Sciences) and Sigma Pi Sigma Physics Honor Society and International

Professionals Directory support the Crediting Plan. Mrs. Luu had none of these

achievements and yet she received 25 points in this area and applicant received 15. This

is inconsistent and uneven agency treatment(page 9) of the rating system. On this single

element alone Akers should receive at least what Lu(with less indicated qualifications

than Akers as listed in the package) received which would be a correction of +10 points

to bring a newly updated corrected score to 58, which means it was erroneous on just this

single element to not have referred Akers to  selecting official provides basis for redress.

  It is further noted that one of the members on the panel(Mai was an Asian female and

the selectee (Luu) was an Asian female—the only Asian female in the applicant pool as

delineated in the certified list of 8 sent to the panel of which Akers was one. This is

extremely coincidental and suggests favoritism and nepotism in light of Akers' prior

statements that Mai had a grudge against him from his earlier days in USPTO training

class when Mai said "some of you are not going to make it at USPTO" and looked at

Akers in class.

-17-

The ratio of Asian SPEs at USPTO to the US Asian population from data is estimated at 30%/10%(US population)=3/1 overpopulation with national figures. It is estimated that the ratio of over 40 year old SPE's to over 40 year olds in the US population may be no more than 40%/50%=.8 so that the ratio of ratios is 3/.8=3.75 biased for Asians and disproportionately large representation at USPTO.(A study done in 1998 by GAO criticized USPTO then for the under representation of American Indians(not claimed yet). In 2004 there was only 1 American Indian SPE in the USPTO as of the date of action. Element 2: "Knowledge of the Scientific and Technical matters Associated with the Patent Process in the Designated Art Area, Akers got 11 points and should have gotten 20 for the following reasons.

  Nuclear engineering was indeed a prerequisite as stated in the Vacancy Announcement for the position in order for the incumbent SPE to judge technical viability of inventions and evaluate conflicting nuclear engineering arguments between an examiner's rejections and an applicant's claimed invention and to tender technical advice to the Director on nuclear engineering issues as stated in the public vacancy Announcement. No other applicant had an advanced degree in nuclear engineering or a PHD in physics and the specialized education required of the position as publicly advertised. The Vacancy Announcement further required knowledge of physics. No other applicant had a PHD in physics but Akers. In the area of providing technical guidance, Akers(although not cited explicitly had been a consulting scientist at Bell Labs for a period also) and had provided

-18-

technical and managerial oversight as president of Amerest Corporation from 1997-1999

in seismology and geophysics besides financial management. Akers had also presented at

USPTO Patent Theatre a financial investment seminar to the APANET organization in

April 2004. It is bad taste by Mr. Will to say "unidentified technology", because had he

truly read the resume he would have known that Akers was in e-commerce at the

USPTO; such a statement supports Akers' contention that the SPE's did not in fact read

the attached resume(as part of the COMPLETE file) and thus were negligent and

deficient in their review and duties and biased in the rank of the best qualified

candidates.

 In the area of recognition by others, Akers provided publications and addressed being

interviewed by the Wall Street Transcript journal(1999/1998) as a researcher in

mathematical finance, and being a member of the National Directory of Who's Who in

Professionals and Entrepreneurs and Sigma Xi scientific research honor society, Sigma Pi

Sigma. Furthermore, in the resume it stated that Akers had provided mentoring to

examiners in other TCs.Akers also cited electromagnetics and acoustics publications

presented at US/Canada symposia and a copy of a published work was also included in

Akers' attached file as a sample of published works. It is false to state that these items

were not before the panel because they were in the package submitted and incredible to

think that if one had the qualifications that Akers did, that Akers would not have

submitted such accomplishments anyway especially when they directly address the

elements in the Crediting Plan. Such statement's destroy any scintilla of credibility in

Will's statements. The correction in the element should be +9 points as virtually every

-19-

element in the Crediting Plan is touched on in Akers' resume, attachments to his file, or

the narrative elements in the KSA's supported by substantial particulars in the resume. It

is noted that Mrs. Luu had only a narrative of daily activities as a contractor or at USPTO

with no global "big picture" view and was ranked higher than Akers with no significant

hardcore scientific contributions or substantive technical advice(manipulating software as

a tool to do scientific calculations is not hard core science but supports hardcore scientific

work). Again this intensifies the unevenness of Agency policy as applying different

standards to Luu and Akers since she had none of these listed qualifications and Will is

attempting herein after the fact to decry Akers' achievements that Luu didn't even have-

this action augments the incredibility of the SPEs' ranking process and actions. This now

produces a corrected running total of 67=58+9


Element 3-"Knowledge of Legal matters Associated with the Patent Process in the

Designated Art Area which includes Demonstrated Competence on Examination Practice

and Procedure or Comparable Experience in the Patent Field". Akers should have

received at least +4 points higher in this area. Akers had a Master's Level Certification

which qualified him (under USPTO standards) to accelerated promotion to GS-14 after

only 2 ½ years from starting at the USPTO. Will's statement that the Master's

Certification(which Luu does not have) only addressed technical issues is actually in

error, because at Akers' oral examination, the Director placed a question to him as to how

in the intellectual property field would one evaluate intangible property using

-20-

mathematical methods-a process which might be used in examination practice. Further, Akers presented laudatory letters from patent attorneys in his file, as cited by OCR and these letters addressed Akers' competence in examination practice. Akers further cited he had completed law school courses in legal writing and research and legal analysis(12 credits) satisfactorily on his resume. This too addressed legal competence. In the production awards received by Akers, patent examination is cited on all his outstanding ratings and Akers had been rated outstanding in these areas for the previous three years as noted in his application package. Ms Luu has no legal education. Akers indicated he was on track for the DOC Bronze medal on his three prior years of outstanding ratings which included outstanding sub ratings in the patent examination practice and procedure. Akers had been on a special project/detail with the Deputy Commissioner for patent Policy involving JPO/EPO/USPTO patent examination and procedure which lasted for sometime and which included comparing methods of examination used by the three offices. Finally, Akers, as well as others, had passed the USPTO Certification Examination which was entirely patent examination and procedures. Mrs. Luu's deficiency in not having the master's Certification and any legal education and Akers' being rated artificially low with uneven standards applied to him vis a vis Luu and correlation with the Crediting Plan adding these addressed elements would add another +4 points to his score. Mr. Will's statements that re-examinations and the16 publications and membership in professional societies were not mentioned is contradicted by the presentation on the resume of all these elements. The resume was attached to all the supplemental supporting materials in the application. Despite this, Luu was rated higher

-21-

and didn't have any of these qualifications as Akers had all outstanding ratings as Luu did and in addition, the elements as listed above. This would make the current corrected score 67+4=71.

Element 4-"Knowledge of Patent and Trademark Office Strategic Direction, Short and Long Term Goals and Policies and Programs and their Impact on the Organization" Akers had been a member of the EEO Diversity Council in 2000 as an individual having Cherokee Indian heritage. Akers had worked on a project to contact Washington, DC universities to recruit American Indians in law school for summer internships. This enhanced the employees wellbeing by proactively working to provide opportunities to American Indian professionals. Akers had received laudatory letters from patent attorneys on patent prosecution which directly reflected on enhancing the quality of PTO services offered to the intellectual property legal community. Community Day Champion was title given to Akers among other USPTO achievers for advancing the ideals of employee health, wellness(Akers is listed in the 1998 USA Track & Field Directory as a marathon runner-listed on the resume too). These wereall included in the resume before the panel to state that these elements "were not before the panel" either uinderscores the negligence with which the panel reviewed files by not even reading attached resumes or else indicates deliberate bias by making false statements were not present when they were after the fact when a poor choice was made having an acknowledged(and no affirmed by EEOC) discriminatory effect as stated by OCR(page 10 of Agency Decision).

-22-

Element 5-"Ability to Communicate effectively Orally and in Writing"-Akers was rated

excessively low. Akers delivered 16 publications in the US/Canada at scientific

symposia. The statement made "delivered a single oral presentation" is completely

wrong. Akers had delivered 17 oral presentations(16 at scientific symposia in

electromagnetics and acoustics, + 1 at USPTO to APANET in April 2004 in financial

analysis).

Furthermore, Akers was interviewed by the news media (The Wall Street Transcript in

1998/1999). The next statement by Mr. Will is devoid of meaning. How many drafts to

publication is irrelevant to publication(p 6).If a piece of work is published it is published.

Even Nobel laureate scientists rewrite their works so evaluating the quality of a published

work by the number of iterations to publication is a metric having no meaning. This

statement underscores Mr. Will's lack of understanding of the scholarly

research/publication process or else emphasizes his deliberate bias to treat Akers

unevenly in the rating system to try to artificially justify the selection of a person who did

not meet the qualifications of the published requirements of the position in the vacancy

Announcement. Although irrelevant, it can be seen right on the publication included in

applicant's file on "Wave Propagation in Inhomogenous, Lossy, Anisotropic media" that

the manuscript was submitted  only once in march 1980 and accepted in September

19890 after only 1 iteration, which would answer the question of the quality of the first

draft being good. The answer to this irrelevant question was right before the SPE and

they were lax and negligent and insensitive to acknowledging its existence. Under these

-23-

elements that the SPEs used as a pretext a correction of +2 points should be appropriate bringing the corrected cumulative score to 71+2=73 points.


 Mr. Will has attempted to rewrite the vacancy Announcement in the Agency's response. The Vacancy Announcement stated clearly that knowledge of nuclear engineering, physics and chemistry were REQUIRED to evaluate patent applications and of course to resolve claim differences in these fields in the art unit. If knowledge of these areas is preferable, even granting this exaggeration of the requirements, that mechanical engineering can be somehow construed to be transferable to nuclear engineering, then why pick an unlicensed mechanical engineering graduate with only a BS over another PHD candidate mechanical engineer who was also a male(sex) and over 40(age)? This fact highlights age discrimination and sex discrimination were suspect and conceded by Agency and affirmed by EEOC for Akers as having a prima facie case for age and sex discrimination, and also reduces the credibility of taking a BS mechanical engineer on the ostensible reason that that is tantamount to nuclear engineering and still bypass a PHD mechanical engineer(this is internally inconsistent). This convoluted logic indicates that the more answers are manufactured to try to justify an error in the past, the more contradictions arise because the premises are false. These premises are not creditable. This action implies additional age and sex discrimination can also be inferred to another applicant on the list as well as Akers underscoring SPE actions inconsistent with EEO policy and placing USPTO in a greater position of liability by enhanced discriminatory

-24-

practices in which Akers' case is just a statistic in a greater USPTO set of violations of policy. Having held a security clearance obviously was listed to demonstrate capability to obtain a renewal(Akers presently has a security clearance).Luu never held a prior security clearance and hence had a greater chance of net getting one than a renewal security clearance would have been for Akers who had held security clearances for 24 years in the defense industry.

If no one SPE had authority as a chair in a committee then why are the only statements made in the USPTO/OCR report in the ranking matrix only those of Mr. Will's? If the other SPEs said identically the same words as pointed out as anomalous by OCR itself in its Agency Decision and the chances of this coincidence are infinitessimal(as shown herein) than it is not true that no one SPE affected others, because these words can only be the words of one person and the other two colluding to try to avoid inconsistencies. On the other hand, if the SPEs were really independent according to Mr. Will then there should have been three independent reports which there is not. Eitherway one is led to a contradiction and the arguments of the SPEs and thus their actions are not credible, which destroys Agency's answer and shows the answers herein to be a pretext for discrimination which EEOC has affirmed Akers has a prima facie case for discrimination on age and sex on October, 2006.

Mr. Will's statement on page 7 of the Agency Decision must be false. Age was clearly inferable from the date of Akers' first university degree as well as other applicants as

-25-

well as the dates of awards, licenses honoraria, scholarships(undergraduate) fellowships,

honor societies.To state that the panel was not aware of the ages is bordering on a lie

from this listed information above on all applicants' resumes.

 On page 7, of Agency Decision Akers was rated just below the certified list(short list) on

position 6 when positions 1-5 were on the short list. This one instance is the only GS-15

list of all the GS-15 jobs Akers eve applied for in NOAA,Census,ITA,EPA,

TC2600/TC3700 in USPTO that Akers was not on the short list and then only by one

position and then only when his score was discount by a third(73 corrected total vice 48

from SPEs where 55 was short list(7 points=covered by errors and omissions) and then

only furthermore by stating false reasons for keeping his score artificially low by stating

these matters were not before the panel which indeed they were and that only one

publication was delivered orally which is patently false(16).

 The statement that Ms. Mai's and Mr. Carone's statements are "substantially similar" to

that of Mr. Will isno justification for omitting them—omitting them is withholding

information and if they are identical—this is collusive. This failure to disclose facts

deprives Plaintiff of an opportunity to evaluate them(page 8 of Agency Decision). The

fact that Ms. Mai cannot recall making a statement is no defense—as anybody can say

that—it is necessary to show countermanding circumstances that would demonstrate the

instant statement to be in question. Akers affirms under oath that Ms Mai said this and

looked at him when he was a new examiner at the USPTO Patent Academy. Further

Akers has seen Ms. Mai pass by his office in TC3600 look in at him and not speak on

multiple occasions. It is also unreasonable to assume that Mai did not know Akers

-26-

because he bought APANET tickets from her for APANET function(Chinese New Year) and was a member of APANET for two years during the time Mai was a member also.

Legal Analysis

OCR concluded and agreed that "Complainant(Akers) has presented sufficient evidence to establish prima facie cases of discrimination based on sex and age. Complainant applied for a position for which he was qualified and a younger female was selected"(p 10 Agency Final Decision-May 22,2006). This position was adopted and affirmed by EEOC in October, 2006.

OCR continues with the single argument hinging on the statement that Agency has articulated legitimate non-discriminatory reasons why Complainant was not recommended to the selecting official. This argument will now be shown to be pretextural and in error and not creditable to establish Agency liability under cited case law and facts of the case.

Management has not articulated a legitimate nondiscriminatory reasons for its activities under BURDINE(450 US 248, 254-255(1981)), WATERS(438 US 567(1978). As was shown earlier in this Complaint, the rating matrix had errors, internal inconsistencies, false correlations, without working papers even between the qualifications as presented by Mrs. Luu and those of Akers when element by element comparison in the Crediting Plan yields disparate treatment between the two where Akers was held to a higher standard then Luu when Luu lacked the particular qualification to try to justify a pretextural rating. Further the statements made by the SPEs in the ROI are asserted to be

-27-

collusive based on mathematical analysis, lacking independence and hence not creditable which would undermine the believability onus of proof on the Agency. The SPEs maintained no working papers to substantiate the scores or documentary rationale for arriving at scores. Their statements were all encased in the statements of a single SPE Thomas Will, are insubstantial, since nothing, no formula, paradigm or methodology is offered to support the ratings assigned in the rating matrix upon which their selection rests. There is no one-to-one matching between the items in the Crediting Plan and the scores received by Akers as opposed to Luu who had substantially less experience, academic credentials, management experience professional and scientific field recognition as Akers but who was rated higher and more favorably against EEO guidelines. A woman, Lanna Mai who had glared at Akers during PTO training was an Asian female and an Asian female was coincidentally selected with less qualifications than anyone else on the entire certified list(including one with a PHD in mechanical engineering over 40 also), not just Akers. The statement that "a mechanical engineer would be just as good" as made by Will is not only false(because mechanical engineering is not just as good as nuclear engineering when the requirement is nuclear engineering) but it is internally contradictory because even if it were so(which it is not) then a PHD in mechanical engineering is would be better than a BS in mechanical engineering in this instance(using the SPEs own words)and this disparate treatment was applied to another male over 40 with a PHD similarly situated as Akers with a PHD in physics(the identical discipline)and MS in nuclear engineering(the identical discipline) and also over 40 for which EEOC has already affirmed a prima face case exists for age and sex discrimination

-28-

in line with OCR's agreement in its Agency Decision of May 2006. This argument refutes
Will's statement he made to justify the erroneous position that even though the Vacancy
Announcement REQUIRES nuclear engineering knowledge and physics it really isn't
important. Such a statement is tantamount to Mr. Will taking matters into his own hands
to try to rewrite the position description as delineated in the public USPTO Vacancy
Announcement. Such an activity is not only absurd, but it is professionally unethical.
 It is well set that electrical engineering and mechanical engineering(and nuclear
engineering too) are all subsets of the universal body of physics. These subsets are also
quite disjoint. To state that mechanical engineering as a disparate subset of nuclear
engineering as a subset of the universal scientific body of knowledge of physics is "just
as good" is a technical statement of unconscionable error. It is not Will's province to
rewrite the USPTO Vacancy Announcement as developed through thorough review of
the position requirements, but only to evaluate qualifications of applicants with
requirements as articulated in the Agency announcement to determine the most qualified
applicant.
Under REEVES(120S.Ct 2097(2000) combined with the prima facie case for
discrimination as found by EEOC in Octobver,2006 in age and sex(Agency Decision p
10,p12) and evidence presented herein of the actions in the ranking process as proof that
the employer's assertion is false in facts as presented in the applicant's package for
review in the CV, such elements may permit the trier of fact to conclude that the
employer(USPTO) unlawfully discriminated(120 S. Ct 2108-2109) under EEO law. Here
the statements and assertions as enunciated by Will and the other SPEs contradict the

-29-

written record of the CV, Vacancy Announcement, Crediting Plan and Ranking Matrix descriptions, scores and assignments which shows them to be false and in error. This combined with EEOC's conclusion and affirmation of USPTO/OCR that a prima facie case exists, meet the test of agency liability under REEVES and that the actions of the SPEs are pretextural and not believable because fraught with error. The reasons provided by the SPEs and addressed in the rating elements and inconsistencies with the lack of supporting materials and false statements about what materials were before them in the review process as well as denial of the requirements of the Agency Vacancy Announcement and attempting to reinterpret and mold the Vacancy Announcement explicit requirements to fit a form to justify bad actions are simply not believable. Such action is not in the best interest of the government and the patent applicant community at large to place an unqualified person in a sensitive area as nuclear engineering into a critical position when national security is at stake. These actions are not believableas the standard under BURDINE(450 US at 253).

Historical statistics and present composition(as of the date of the discrimination) in 2004 in management practices at the USPTO demonstrates the creation of a plethora of Asian SPEs.From Akers' first hand experience in half a decade at USPTO and at APANET he estimates the amount of Asian SPEs at 30%(precise figures will be evaluated on depositions and review of Agency records for compliance with EEO guidelines), while the US population is known to be about 10% from public data so that Asian representation is out of line at the USPTO at the SPE level by 30%/10%=3/1.

Management departed from its normal policy of seeking the most qualified applicants(all

-30-

were coincidentally over 40(PHDs having prior management experience) in preference to a less qualified Asian appointment that was already overrepresented at the USPTO by statistics. Exact figures may be even higher and are obtainable through production of records and documents requests through the Court. The reasons offered by the employer were not the true reasons but were a pretext as has been shown because the reasons offered by the SPEs are not believable, lack credibility and in many cases were shown to be presumptively false assertions.(BURDINE-450 US 256(1981)).

Under LOEB(600 F 2d, 1003, 1012 n6(1st Cir 1979) the more idiosyncratic or questionable the employer's decision the greater the likelihood of exposing it as pretext. Here, the USPTO SPEs acted inconsistently and made false statements about applicant's qualifications and his submitted materials and treated Mrs Luu more favorably by trying to deemphasize Akers education, professional experience, management experience, licenses, professional affiliations, publications and honors and career(also in retaliation claim too) at the USPTO while not even applying the same standards to Luu because she didn't even have the qualifications to begin with to criticize. The idiosyncratic and questionable activity supports the exposition as pretext under LOEB, which when also combined with EEOC's affirmation of prima facie case of age and sex discrimination of October 2006, supports agency's liability as management rebuttal is not believable under BURDINE. Past dissimilar treatment of unequal treatment of Akers' qualifications vis a vis Luu's as well as the erroneous statements made by the SPEs themselves on Akers' qualifications and record underscores mistakes, errors and

-31-

questionable credibility and permits a finding of intentional discrimination under

REEVES(120 SCt 2097 2000) also.

## CONCLUSIONS

OCR has articulated and EEOC has affirmed a finding of prima facie case of

discrimination based on age and sex in its Agency Decision(p 10/p12). Akers has shown

herein under the provisions of BURDINE,LOEB,REEVES cases and their progeny that

the actions by management are not only not believable but they are collusive and border

on prevarication. Thus the articulated reasons by management to rebut the implication of

discrimination are not only pretextural and not the real reasons and the not believable and

agency liability is prescribed under the test established by REEVES. Furthjermore, even

if these reasons are not pretextural which they are shown herein to be, even absent a

discriminatory intent, if a discriminatory effect is achieved which it was here, in denying

a more qualified applicant in a protected age group over a less qualified member not in a

protected class then under (Illinois Policemens' Association-S. CT-March 2005) this

alone is sufficient to establish agency liability as an alternative test.

Statements made by OCR on page 11 of its Agency decision is substantial error. Akers

was not one of the lowest ranked applicants but rated just below the SPE short list(6th

where 1-5 were referred). This fact, combined with the fact that at USPTO Akers had

made the short list in TC2600 and TC3700 as well as at other agencies as an external

applicant(NOAA/EPA/Census/ITS) casts grave doubt on the credibility of the standards

applied by these SPEs relative to the historical normal performance of Akers in other

competitions both within and without USPTO. So much contradictory evidence further

exacerbated by the virtual certainty of collusion , and false statements about Akers' application on the written record, absence of working papers and guidelines used to rate applicants, presents wide open opportunity to abuse the system of fairness. It is not believable that it is in the best interest of the government to appoint the least qualified applicant who does not meet the basic requirements of the vacancy Announcement and the fundamental knowledge required of the position to say nothing of the potential national security  risk with a less qualified applicant reviewing nuclear patents in a field for which she has no knowledge. There is further an overabundance of Asian SPEs at the USPTO and this reverse discrimination action further aggravates the problem.

 None of the panel members were able to justify anything. First, two never spoke. Secondly, Thomas Will's statements, even if assumed to be that of the group have been shown to be in error, riddled with exaggerations, inaccuracies, contradictions and mistakes as well as incredulities. The specificity indicated in Akers' resume along with the specific management functions,degrees, relevant education and copies of publications and degrees from universities listed where he had been an adjunct professor were certainly specific. Making the statement that these elements as delineated are "too broad" has no merit at all—it doesn't even make sense-and is vague and is defective of the standard used to make the statement.

 OCR admitted that the panel offered no support for justification of the scores(p 11 Agency Final Decision) nor for the reasons it deemed Luu more qualified when on the record she certainly is not. Luu simply offered a narrative of the things she did in lower level jobs but simply this narrative detail is not a substitute for high quality achievements,

-33-

higher job responsibility, education offered by Akers. It is also a mischaracterization in the statement that Akers provided half page summaries—these were simply that— summaries to lead the reader to the detailed record attached(resume) which was the greater amplifications of the elements in the general pre-summaries cited. The fact that the substance of the application is in the resume(further amplification) and referenced in the summaries is no excuse for a cursory review of only the summaries and does not excuse a reviewer from studying the entire file as consolidated and attached to ascertain the best qualified applicant.

The panel members did in fact not justify the specific scores they gave and also did not provide a detailed statement and substantive reasons about Akers' resume because the statements they made did not correlate at all with the elements in the Crediting Plan and the elements as identified in the resume, hence the panel's actions are again defective. In cases where the selectee was treated more favorably than Akers she did not even have the elements as identified in the Crediting Plan that Akers had yet she was treated more favorably without them. This is uneven Agency policy at variance with EEO laws as cited earlier.

The statement that the panel members said they did not know the applicant's ages is also incredulous since degrees had dates of award associated with them. It would have been obvious to anyone that a method of estimating an applicant's age based on the year of first degree(BS) being at least 21 years of age existed.

Although OCR correctly concluded that a prima facie case of sex and age discrimination existed, and later affirmed by EEOC in October,2006, it is error in further stating that

-34-

there is not quite sufficient evidence to suggest that the proffered reasons given by the

Agency for the selection of a less qualified applicant based on the written record is

pretext or not believable in the context of case law cited herein (REEVES, BURDINE,

LOEB,WATERS).The record reveals grave irregularities in the process of ranking from

internal inconsistencies in scores, high correlation of collusive activity, omission of

material facts submitted in Plaintiff's resume and before the SPEs for the record review,

mischaracterization of the Vacancy Announcement as published for the public, side

stepping the gravity of the capacity to obtain a national security clearance in a critical

area when dealing with the Atomic Energy Act in the interest of a fiduciary responsibility

to the intellectual property community at large in nuclear science, lack of any

substantiation of scores thereby permitting license to say anything without accountability,

mischaracterization of the discrimination activity by erroneously stating that two males

were in a protected group on the panel they were not at time of appointment which is

what is relevant and controlling—the age at appointment to demonstrate USPTO SPE

appointment policy, and the fact that an Asian female was on the panel and the only

Asian female applicant was picked who had the least qualifications of any of the entire

applicant pool, not just Akers.

   Akers' qualifications were in fact "plainly superior" under VARLEY(EEOC Case No:

01972338(1998) and THORNS(EEOC Appeal No 05930308 3945/F5(1994). Akers has a

PHD in physics as required by the agency announcement(physics). Akers has an MS in

nuclear engineering as required by the USPTO Vacancy Announcement. Akers has an

MBA in management/finance(for management requirements in the SPE position), has

-35-

been an acting-SPE and a manager in industry for over 20 years. Akers had held a

security clearance for 24 years demonstrating the requisite capacity to gain the

clearance(presently has clearance) for the sensitive national security technology(nuclear

engineering/physics). Akers has had a myriad of awards throughout his tenure to date in

2004 at USPTO for production, patent examination, mentoring as an adjunct professor at

7 universities, 17 publications, national recognition in electromagnetics, acoustics and

hard science. The next statement indicates total error as how can one compare a BS in

mechanical engineering with a PHD in physics/MS in nuclear engineering/BS(minor in

chemistry)/publications/security clearances held/licensed professional engineer/20 years'

management experience in industry and make such a statem3ent as found on page 12 of

Agency Decision that "a comparison of Complainant's application and that of the

selectee does not support this conclusion." This statement is at variance with OCRs own

statement on page 11 that Mrs Luu possesses only "some" management experience,

certainly inconsistent with the above citation. This inconsistency suggests attempts to

repatch errors previously made by erroneous statements and further destroys the

credibility of the agency's position.

 The footnote at the bottom of page 12 of Agency Decision that "The panel members

indicated that you shared additional information on your affidavit that may have had a

bearing on your scores in the specific rating factors but this information did not appear on

your resume or supporting materials" opens up the new question since nothing more was

added to the affadavit than had been contained in the attached resume and supporting

materials, may represent a concession by the panel that they misrated Akers hereby. This

-36-

would provide the basis for future case resolution and reinstatement at the Agency at the position sought-- GS-15 with back pay and interest.

OCR already has found basis for discrimination and has been affirmed by EEOC in October 1-06. this is consistent with SAHAD(636 F 2d 1116,1118 n3 FEP Cases 1338(6th Cir 1980).Akers does not claim management made decisions arbitrarily; it has been shown herein that inconsistent treatment, contradictions collusive activity, mistakes, mischaracterization and retaliation coincident with the filing of the claim under the case law of BURDINE,LOEB,WATERS,REEVES that agency liability should follow andthat monetary damages for retaliation are also recoverable under WHITE v. Burlington Northern Railroad(St Court 6/22/06) for malice.

Wherefore, it is prayed that this Court will grant Plaintiff the relief he requests of reinstatement at GS-15 level at the USPTO with back pay and interest and monetary damages as asserted herein for retaliatory actions by the USPTO during the filing of an EEO claim against the agency which to date has already been found by EEOC to present prima facie case for age and sex discrimination.

Dr. Geoffrey Akers, PE, MBA

Complainant                                                February 1, 2007



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Geoffrey R. Akers,
Complainant,

v.

Carlos M. Gutierrez,
Secretary,
Department of Commerce,
Agency.

Request No. 0520070130

Appeal No. 0120063723

Agency No. 045686

<u>DENIAL</u>

Complainant timely requested reconsideration of the decision in *Geoffrey R. Akers v. Department of Commerce*, EEOC Appeal No. 0120063723 (October 19, 2006). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. *See* 29 C.F.R. § 1614.405(b).

After reconsidering the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 0120063723 remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

07 0266

<u>COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION</u> (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive

FILED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2                                                      0520070130

this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

### RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").
FOR THE COMMISSION:

*Carlton M. Hadden*
—————————————————
Carlton M. Hadden, Director
Office of Federal Operations


    **DEC 2 8 2006**
—————————————
Date

3                                    0520070130

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Geoffrey R. Akers
25 Lincoln Ave
Norwich, CT  06360

Pat Boylan, Director
Office of Civil Rights
US Patent & Trademark Office
Department of Commerce
600 Dulany St., Rm. 7D07, East
Alexandria, VA  22314


DEC 2 8 2006
Date

Equal Opportunity Assistant

UNITED STATES PATENT AND TRADEMARK OFFICE
OFFICE OFENROLLMENTAND DISCIPLINE

IN RE: GEOFFREY AKERS                    FILE NO: E2005-17

## RESPONSE TO SHOW CAUSE REQUIREMENT

The undersigned Applicant hereby provides his Response to the OED Show Cause Requirement dated 2/28/06 in the above referenced case. Applicant seeks to be registered as a patent agent. Applicant addresses the elements cited in Agency's Requirement to show why his application should be granted.

HISTORY

At the time applicant retired from the USPTO he had received a satisfactory rating for his last year and three outstanding rating as for the three prior years and a satisfactory rating for his first year for the five years he worked at USPTO. Additionally, he had made rapid progress in promotions and cash awards in his five years at USPTO attaining the rank of GS-14 in 2 yrs 7 months after having arrived at the USPTO as a GS-11 in 1999. Upon retirement, applicant filed his application for patent agent under the four year examination waiver provision. Following a series of communications in June 2005 and August 2005 and again in February 2006, OED has now listed two applications for further comment and clarification to address as well as ancillary elements in Other Considerations.

## DISCUSSION

In recapitulation, Applicant cites relevant portions of Interviews cited in the Show Cause Requirement. In particular in March 2004 Mr. Millin told applicant that this was an "appearance" of a conflict of interest to others( not necessarily a real one which in fact it was not).Residual cases from AU3624 were still left on Applicant's docket when he transferred to AU 3625 to avoid the appearance of a conflict of interest. Indeed as has been seen in the Show Cause Requirement only two cases are being addressed of the 150 cases done in the period March 30, 2004-September 30, 2004.

Following the first Interview in October,2004, Akers made several attempts to have 705/35-45 cases transferred off his docket that still remained in communication with Mr. Millin. Ultimately, Wynn Coggins transferred the cases off Akers' docket over to Mr. Millin's docket in October 2004. In Interview 1 Millin stated a conflict of interest "issue" consistent with Akers' statement that this was appearance and not necessarily a real conflict because Akers' area of mathematical finance/portfolio construction and modeling is indeed different from the actual subject matter of the single case addressed(09/816905-A Method of Closing Commercial Loans ) as the other case 09/702104 was an abandonment by the inventor as his attorney had stated that the inventor had decided not

fact abandonments were given up by Akers to comply so as to reach this action as seeking out a case unrelated to his outside activities would make no sense.

Addressing each case, we have:

Case 09/702104:

Applicant's Attorney Peterman signed a statement in the prosecution stating that the applicant had decided not to expend further resources in the application(Ex D). Attorney Peterman was the Attorney of record. USPTO procedure requires an Interview Summary to be done when calls are made to applicant's attorneys regarding abandonments. Interviews are not conducted with attorney's secretaries. Attorney Peterman had submitted a physical statement noting his allowance of the case to go abandoned.Attorney Vinh Luong stated this was an "implied abandonment" at Interview 1 in October 2004 and Anne Mendez recorded this statement in the record. Citation on Interview Summary(EX C) notes that the attorney did in fact sign a statement in EX D that no further prosecution was being conducted(no funds additionally expended). Following several attempts to contact Atty Peterson, no response was received and after a reasonable length of time the case in fact did go abandoned. Atty Peterson was listed as the responsible individual as the interview summary is a record of communication between Examiner and the Applicant's attorney with Atty Peterson as the responsible party. Interviews are not conducted with secretaries. Ms Ferrara was an intermediary. Since the communication record is a written record of communications by the USPTO with Applicant's attorney it is natural to list the cognizant and responsible party as the contact in any communication record(Interview Summary), not a secretary. This is the purpose of listing the attorney in the spirit of the law. Since the end result was in fact an abandonment as delineated by applicant's attorney anyway, , no harm was done through this innocuous listing for the record.

Case 09/816905

This case involved a commercial mortgage closing process. Akers has never even attended a mortgage closing process, nor does Akers even have a mortgage. Akers has designed mathematical algorithms for constructing investment portfolios in the fixed

income markets(bonds) as far back as the 1970's far anterior to the date of this invention and presently does the same.

In Interview 2 it is noted that this case was in electronic form. Inconsistencies in the record in Interview 1 and Interview 2 reveal that it was initially assumed that the case was physical to take, but then that theory was refuted by showing it was in electronic form and could not be taken from another's office or without someone else knowing about the transfer in the electronic messaging system.

Director John Love asked a good question in asking Akers if he realized it was another's case, to which Akers responded that cases in 705/35-45 were still mixed up even as late as October 2004 when Wynn Coggins transferred cases back to Millin on Akers' and her resolution to this subclass mixing problem following Interview 1. Akers had been the examiner of record since 10/26/2001. Assuming arguendo that Akers had some interest in the case, why would he have not allowed it three years earlier and gotten an earlier priority date?

Page 5 in the statement of Director Love is not accurate. The prior work to March 9,2004 all HAD indeed been done by Akers. Akers did the first office action, the final rejection and prosecuted the case from 2001-2004. It was only transferred to Hani Kazimi from March 29,2004-Sept 21,2004. According to the prosecution record, the appeal brief was forwarded to the examiner, presumably Kazimi on 9/21/04. Director Love acknowledged mix-ups on Page 7. Even for four mix-ups in 150 cases over the period March-Sept 2004 with these cases still rife and extant as late as October 2004 on Akers' docket , the 705/35-45 cases are within statistical error of mix-ups and oversights(2%). The statement of Cooper on Page 7 although understandable, by suspicion,  is untenable as confirmation with applicant's attorney reveals that Akers never had contact with applicant's attorney and formed no "deal" with him.

With reference to the conversation between Millin and Kazimi on Page 8, it is believed that a plausible explanation to this mixup is that Hani Kazimi asked Akers to do the Appeal Brief because Akers had done the entire prosecution history from the beginning on this case. Since all the fundamental work had been done PRIOR to the end of the second quarter(March 9,2004) it would appear that acting SOLELY on the researched prior art of record(prior to the date of March 31,2004-transfer date to AU 3625) would not impinge on even an "appearance" of conflict of interest(net even real to begin with) because no new work was actually being done that not already been done while Akers was in AU 3624. AsAkers stated on Page 8, Akers left Virginia at 5 AM on 9/30/04 (Confirm No: HC-63-ZC on Southwest Airlines) to travel home to Connecticut and was not even present to ask LIE to transfer this case.

It was standard practice for Akers and Kazimi to handle the most difficult cases in the Art Unit. Indeed, from February 2003-March 2004 Akers and Kazimi were the two lead primaries in AU3624 before Akers transferred to AU 3625.Akers and Kazimi were close friends, and each would do reciprocal favors for the other and for Vince Millin when dated cases for the Art Unit had to be done by a given due date. There had been times when Akers had done cases for Kazimi and had had cases transferred when they weresubmitted—this case herein could have been just another one of these instances where an oversight occurred regarding what class the specific case was in.

## LEGAL STANDARD

Demonstration of good moral character is indicated in the fact that Akers has no criminal record, has held DoD security clearances for 25 years, has held securities licenses for 12 years (current) has been a licensed Professional Engineer for 34 years(current)(equivalent to attorney registration in the bar) , has been Vice President of the Board of Trustees of Three Rivers Community College in Norwich, CT and is known for integrity throughout the Norwich community. Furthermore there are numerous business associates with whom Akers has had business relationships throughout the past 35 years who can attest to his integrity as well as his church associations.

## GOOD MORAL CHARACTER CONCERNS

Applicant issued an allowance prior to September 30,2004 based on the art of record and his own prosecution of the case from 2001-2004. The footnote at the bottom of page 11 is without merit itself as there is no inconsistency in the dates. Millin in the Interview said that Akers transferred the case on Sept 30—that is inconsistent since Akers was not there. The allowance was written a few days prior to Sept 30. It is noted that about the middle of September, 2004 Millin had art unit meeting(with all examiners present) and stated to all that quality review of cases for the year ceased from Sept 15-30 and if any cases were to be allowed, it would be an opportune time to consider this activity. |This case was allowed during such a period consistent with Akers' view of the allowability over the art of record.

The argument on page 12 is internally inconsistent. Akers allowed the case in late September, 2004 yet the investigation was not even announced until Interview 1 on October18,2004 AFTER the allowance. Additionally, Director Love stated on November 18, 2004 to Akers and Vinh Luong that "we do not have a case yet" with respect to the mixed up cases addressed here(2/150=1% at issue herein).

The evidence in fact is not indicative of a pattern of deceitful activity because there was NO INTENT to avoid appearance of a conflict of interest because these cases were done before the Interviews and for which there was a case mixup on the split dockets that caused cases like this to become commingled inadvertently by all parties. Given the actual small number of cases herein at issue(2), statistical error in doing such cases through mixups could easily be expected.

Even Millin asserted to Akers that this was an "appearance" of a conflict as early as March,2004 when this matter began. The assertion made that the unrelated areas of research between this singular case 09/816905 and the 35 year pattern of portfolio model construction are related is unfounded and does not in the least indicate attempts to impute a palliative effect on "appearances" of a conflict of interest. The patent agent's license does not permit one to practice law but only to represent applicant's before the USPTO. It is believed that the cited case is not on point with the elements of this matter.

Circumstantial evidence actually supports the opposite conclusion. As a matter of record, this matter of these two case issues did not arise until after Akers filed a simultaneous EEO complaint for non-selection as a SPE with EEO in August 2004. EEO rules specifically address that retaliation, through the creation of a hostile work environment is forbidden. Repeated questioning of the same two

cases(June,2005/August,2005/February 2006) may be construed as an attempt to create an inconsistency with Akers' testimony and provides circumstantial evidence of a lack of good faith and supports retaliatory actions by the Agency against Akers while his EEO complaint continues through the judicial system. Applicant has offered exculpatory evidence of clear reputation for 59 years now and has had no contact with the inventor of the application except to demonstrate that there never was a contact except as in an official capacity on the application and that no "deal" ever existed as theorized by Cooper in Interview 2 on November18,2004.

Applicant has already addressed the element in case 09/702104 of the designation of the attorney as the responsible person of record in the office communication in the abandonment. The weight of the evidence again demonstrates exactly the opposite conclusion. The attorney signed a communication confirming an abandonment in the initial stage and never returned multiple phone calls when Akers called attorney's office about this abandonment for a reasonable length of time. Furthermore, Attorney actually allowed the case to go abandoned. No harm was done in listing attorney as the cognizant/responsible agent of record and the argument on page13 is without merit as it was attorney himself who signed the abandonment statement(no further funds to be expended in prosecuting claims) and also stated he allowed the case to go abandoned anyway. Interview Summaries have to be entered into the case file and a responsible individual(attorney) had to be entered, not a secretary

There are no moral character problems now or any other time in Applicant's entire past. Applicant has in contrary, functioned as a mentor to examiners, and as a counselor to applicant's(and parents) for admission to Columbia. The two cases here, the crux of Agency's entire argument are only a small part of a much greater systemic problem of unmanaged dockets occurring as overlooked by overworked SPEs and Primaries, NOT deliberate attempts to do extra unrelated cases. There was too much work to do, at USPTO and not too little.

Applicant requests herein that OED provide copies of all transcripts from Interviews 1 and 2 and extends the period of response to May 1,2006 for Applicant to receive any collaborating confirmation from witnesses in the matter of these two cases.


March 10, 2006                                    (Dr.) Geoffrey Akers,
                                                  Applicant

## Akers, Geoffrey R.

**From:**  Akers, Geoffrey R.
**Sent:**  Tuesday, March 14, 2006 10:10 AM
**To:**  'harry.moatz@uspto.gov'
**Subject:** Rebuttals and Responses(Akers)

Mr. Moatz:

I have mailed a preliminary rebuttal to your office in the above cited case. I am sending a Supplemental Rebuttal today with respect to updated material forwarded to me on the case history and file. I will fax an advance copy to you shortly with the physical to follow to meet response times.

I have requested complete case history and Interview summaries. The ones I have received are defective and deficient in material contents.

Dr. Geoffrey Akers

UNITED STATES PATENT OFFICE

OFFICE OF ENROLLMENT AND DISCIPLINE

IN RE: GEOFFREY AKERS                    Application: E 2005-17

SUPPLEMENTAL RESPONSE AND REBUTTAL

The undersigned applicant hereby furnishes this Supplemental Rebuttal and Response to further elements supplied him from OED.

The following are facts:

Akers received a satisfactory and a bonus for the period October 1,2003-January 5,2005.

Akers had been licensed as a securities principal all during the period of time while at the USPTO with Vincent Millin's knowledge because in March 2002, Millin told Akers to list all his securities licenses in his dossier for his USPTO Master's Level Certification and which are indeed listed there. Citing the outside affiliations as an independent as noted is irrelevant because as a principal full and fair disclosure is required and Akers did this with the NASD telling them of his work at USPTO as his primary employment. Akers was an independent with outside investment firms and a federal employee for the entire period at the USPTO and no conflicts ever arose then, so why now?.

The file is defective. The four remaining cases that Millin listed that were challenged in the performance rating were all rebutted by Akers, yet his rebuttals have been removed from the case history. The file has been tampered with and is defective.

In Interview 1 Vinh Luong, POPA attorney noted that case 09/702104 was an implied abandonment, but this does not appear on the record. The record is defective again.

In Interview 1 Akers noted that Millin left 705/35-45 cases on Akers' docket from another Art Unit. Millin was the SPE and managed the docket, not Akers. It was Millin's responsibility to divide the docket at midyear and he did leaving these other cases still on there. Akers did not divide the docket in March 2004, Millin did and he assumed the SPE responsibility to manage the docket as it states in the SPE job description to manage dockets.

In case 702,104 Akers called Peterson's office(attorney of record). Akers, as stated and signed by the attorney himself, asked in the inventor was abandoning the case. The secretary talked to the attorney(as stated by the attorney when examiner called), and the attorney told her that client had decided to let case go abandoned. The secretary relayed this information to the Examiner who listed the attorney as the contact responsible

individual because attorney had spoken to the assistant herein and assistant relayed this message to Akers as delineated by attorney himself in his signed statement. Furthermore, going another step further, Examiner had requested that attorney send an e-mail, in which he would further cite the abandonment. A reasonable length of time passed and attorney failed to respond. It is well set that failure to respond to a request may indeed constitute failure to challenge. There was no other conclusion for a reasonable person to make by to take the written record that the case had been abandoned and attorney's failure to respond as lack of interest and lack of challenge of Examiner's presumption of an express abandonment. In Interview 1 Vinh Loung attorney from POPA asserted that this indeed was an implied abandonment, his statements of which have been deleted from the record and makes the record on interview 1 defective and incomplete. Attorney's statement that he wasn't requesting an abandonment but that he let the case go abandoned and failure to act by failing to respond to examiner's questions placed to him through the intermediary of the secretary is not well founded.

Anne Mendez cited that Akers' retirement was effective "before an action was proposed in this case." Thus at the time of the retirement, no case had been made as consistent with Director Love's statement to Vinh Luong and Akers that "we do not have a case yet" on November 18 following Interview 2. Akers left in disgust as a result of what he felt was shoddy treatment of him to suspect him of such calumny in the light of his good work done over the previous 5 years at the USPTO. This was tantamount to lack of appreciation of good work done(three outstandings and two satisfactory ratings and cash bonuses each year for five years) and Akers felt this was a hostile work environment created interestingly at the same time as his EEO complaint for age discrimination in SPE selection after having been on the SPE Certified List in TC2600 and TC3700 in 2004.

In Interview 1 Vincent Millin stated an error as on 9/30/04 (Ex B) he stated that Akers on 9/30/04 asked the docket clerk to transfer the case to him, but on 9/30/04 Akers was not even at the USPTO as cited in his travel home to Connecticut, he flew on 9/30/04 so this statement is not possible.

It is clear now that the LIE must have transferred the case to Akers between 9/21 and 9/26 because Akers had done the entire case prosecution earlier viewing the sheet with the Phoenix Applications Management System in the file. From this, and from the fact that so many cases were done at the end of the year, a mixup(as Director Love says he could understand in Interview 2) must have occurred. Since the case was allowed over the "art of record", no new prosecution was done(the case matter prosecution had been already done by 3/9/04 prior to the date of 3/31/04 when Akers had still been in AU 3624.Akers had 133% production and did not need counts. Akers has spoken with Applicant's(Creamer) attorney as recently as 3/10/06 who confirmed that the attorney never had any outside dealings with the examiner prior during this period.

In Interview 2 it was noted  case 09/816905 was in electronic form and had been transferred to Akers(by the LIE, noting the PALM report in the file). Akers cited that he had e-mailed Millin many times to take cases off his docket following Interview 1 in

which Akers had been then made aware that there was a potential erroneous mixup in the his docket. The e-mails were sent in October NOT September because Akers had not been aware of a subclass mixup prior to the October Interview 1 when these few cases were addressed. The statement by Director Love(p 6 Int 2) that Akers had not worked on the case before is inaccurate as Akers had done the entire case prosecution to the final office action while still in AU 3624. Thus the conclusion was erroneous on page 6(Int 2).

Considering the 150 cases done from March 31-2004 until September 30,2004 only really 1 case is in issue here, case 09/816905 since the other case is in 09/702104(AU 3625) and NOT a prohibited subclass.

It is believed that thestatement on page 7 of Interview 2 by KC is in error. The docket clerk transferred the case to Askers, not the other way around since on the PALM report it was listed with Lorraine Walden on 9/21 and then to Akers on 9/26 when the Appeal Brief came in and it could have been natural for one to transfer it to Akers since he had done all the case prosecution earlier and done unwittingly.

In Interview 2 p 7 it was noted that Vincent Millin had said to Akers he was taking the prohibited part of the docket away and that I was to work on the rest of it. This case had been done before the docket had been split anyway and was "out of bounds" with respect to the prohibited class(ie PRIO|R to transfer to AU 3625 at March 31). Even arguing for this sake that the case had been worked on during the prohibited period(March-Sept 2004(which it was not), since it was not in principal prosecution, as it was allowed over prior art of record done before Akers transferred to A|U 3625 and was just a residual from the time period when Akers had been in AU 3624 and the art not prohibited).No other issues were brought up at any interview on any other cases as addressed by Millin on page 7 of Interview 2 and for which no issues were set forth. Only cases 702104 and 816905 are at issue.

Case 09/702104 has been addressed earlier. Additional examination of case 09/816905 continues.

It is set that claims are patented not specifications and discussions, Viewing the claims of Application 09/816905 they relate to commercial real estate loan processing noting "reviewing appraisal environmental and engineering information", "signed loan applications, "closing the loan in 240 hours" the loan closing team "drafting a loan closing document" "processing a commercial loan" "clearing title through a title company" as well as Figs 1B/credit report, Fig 1C(title company)Fig 1D(flood certification). Akers derived mathematical algorithms for optimum portfolio management for entities in corporation bonds and treasury securities completely removed from streamlining in a commercial loan for a sole borrower where corporations deal with large classes of creditors not individuals who apply for real estate loans and for whom credit checks are required.

Earlier it was stated that Mr., Millin had conferred with Mr. Kazimi about case 09/816905 and THEY agreed(Akers not included) to transfer this case back to Kazimi on or about 9/30/04 after the docket clerk asked if Akers should get the count by Sonya Williams(a different LIE than the one(Lorraine Walden who had transferred the case to Akers originally apparently believing Akers should get the prosecution as it had been his prosecution history throughout the life of the case prosecution from the first office action at USPTO)). HOWEVER, the case was NOT transferred back to Kazimi until 11/4/04 when SPE (now Director) Wynn Coggins, Akers' new SPE in AU 3625 transferred it off Akers' docket to Millin, who had failed to transfer it back all during this month and coincidentally when the Interview 1 was progressing.(Case history element 26 and 25) on October 19,2004(see PA|LM Intranet Ex E)(Millin had the case transferred to him from Coggins who recognized Millin's deficiency in not taking the case off Akers' docket as he should have following the discussion with Kazimi in which Akers had not been privileged.As seen in Palm Intranet Ex E Akers had primary prosecution of this case since 9/11/03.This was as a minimum an act of laxity on Millin's part.

Viewing Phoenix Applications Management System reveals a more distressing fact. There, it shows Walden(LIE) transferring the case to Akers(which could result from Akers having had primary prosecution for the period from first office action to final office action, then the case transferred to Kazimi for only 2 days(9/29-10/1) and then the case transferred back to Akers|(while Akers was on vacation from 9/30-10/13) and then placed BACK on Akers' docket from 10/13-10/17). This occurred transfer back at 738 AM on 10/13/04, but Akers typically did not arrive in the office until 930 because he flew from Connecticut Monday mornings and arrived from BWI by 930. Thus Akers could not have transferred the case back to himself on that day.This was done by someone ELSE. For the reasons stated below, it is believed that person was Vincent Millin.The day before Interview 1(Oct 19) Millin transferred the case back to himself to keep it out of Akers' docket(546 PM 10/18/04) and appear compliant. Cross correlating this report with SPE Coggins transferring the case back to Millin on 11/4/04 demonstrates that Millin transferred the case back and forth onto Akers docket.

When one realizes that there is a simultaneous EEO age discrimination Complaint for SPE non selection when Akers was the only candidate on the entire list with the identical qualifications as required in the Vacancy Announcement(physics/nuclear engineering/chemistry/security clearance) and holds a PHD in physics as delineated in the announcement and has been a program manager, Deputy Director of Systems Engineering, Director of Advanced Development, and principal engineer in industry for 20 years earlier, and the treatment in TC3600 here is inconsistent with Akers' treatment as a Certified SPE candidate in TC3700 and TC2600(on the short list) and the fact that Millin called Akers on 12/2/04 at 10:17 AM at his home in Connecticut and threatened him to retire or Cooper would be mad, and the fact that other known relations exist between the SPEs on the Selection Panel in this position here and friends of Millin, it is a set of circumstances for retaliation against Akers for exposing the errors committed in not selecting the most qualified person for the position, one of national security(nuclear engineering) and one for which the selectee had no knowledge and only a BS in

mechanical engineering completely outside the area of consideration of the Vacancy Announcement as advertised to the general public and for which there is some question on the selectee's ability to gain a US clearance in a sensitive technological area as nuclear energy. Furthermore Akers holds an MS in nuclear engineering and had worked in this area with Navy submarines earlier.

Millin's communication to Anne Mendez at the USPTO attempting to promote Akers' trustworthiness is slanderous. No problem existed in 5 years at the USPTO on ethical issues for Akers, none in his entire working career prior or now, none now and this statement exposes Millin and the Agency to potential liability in an EEO retaliation claim that is currently progressing through the judicial process. On one hand, Millin gave Akers all outstandings and satisfactorys and on the other he attempts to malign Akers on 1 case in 150 which has nothing to do with the area of work that Akers ever did outside the USPTO and for which Millin knew about as far back as March 2002 when Millin and Akers assembled his dossier for the USPTO Master's Level Certification examination(done in June 2002) listing his securities principal licenses. This coincidental behavior now that Millin has displayed is unconscionable and exposes the USPTO to retaliation counter claims on the EEO complaint and actionable punitive damages.

The Applicant seeks his registration as he submits that he has met his requirement of good faith with his record, explanation of the two cases at issue and all collateral elements.

March 14, 2006

Geoffrey Akers,
Applicant

## Akers, Geoffrey R.

**From:** Akers, Geoffrey R.
**Sent:** Tuesday, March 14, 2006 10:10 AM
**To:** 'harry.moatz@uspto.gov'
**Subject:** Rebuttals and Responses(Akers)

Mr. Moatz:

I have mailed a preliminary rebuttal to your office in the above cited case. I am sending a Supplemental Rebuttal today with respect to updated material forwarded to me on the case history and file. I will fax an advance copy to you shortly with the physical to follow to meet response times.

I have requested complete case history and Interview summaries. The ones I have received are defective and deficient in material contents.

Dr. Geoffrey Akers

# SUMMARY OF ETHICS RULES

## UNITED STATES PATENT AND TRADEMARK OFFICE

## 2002

## UNITED STATES DEPARTMENT OF COMMERCE

## Ethics Division
## Office of the Assistant General Counsel for Administration
## (202) 482-5384

## FINANCIAL CONFLICTS OF INTEREST

### Basic Principle:  No Self-Dealing

**Financial Conflicts of Interest.**  You <u>may not</u>, as part of your official Government duties, participate in any matter that will have a direct and predictable effect on your personal financial interests, unless an exemption applies.  This rule applies to matters involving specific parties in which you have a financial interest and to broad policy matters that affect many entities, including ones in which you have an interest (such as a policy affecting an entire industry sector if you have stock holdings in one of the companies in the industry sector).

**Financial Interests of Relatives and Business Associates.**  The financial interests of some persons are considered so intertwined with your own that they are attributed to you for purposes of the conflict of interest statute and you are barred from participating in matters affecting their financial interests.  These include the financial interests of your spouse, minor children, household members, general partners (but not limited partners), and non-Federal employers; persons with whom you are seeking employment; and entities with which you are serving as an officer, director, or trustee.

***Exemptions*.**  Exemptions permit you to participate in matters affecting a financial interest if the financial interest is a:
* holding in a diversified mutual fund;
* holding in an industry sector-specific mutual fund or geographic sector-specific mutual fund valued at $50,000 or less (if all interests in sector-specific funds that concentrate investments in the same sector total $50,000 or less);
* publicly-traded stock or bond holding of $15,000 or less in a company if the company is a party to a matter (or $25,000 or less if the company is not a party to a matter) with regard to a specific-party matter; or    $H.Cy = 0 . \cdot U$
* publicly-traded stock or bond holding of $25,000 or less in a company with regard to broad policy matters (if total holdings in the industry or group affected by the matter are $50,000 or less).    $Hhf = 0 - \cdot au$ ✓

***Waivers*.**  Individual conflict of interest waivers may be issued by the head of USPTO for interests that are not substantial (following consultation with the Office of Government Ethics), but Department policy is generally not is issue such waivers; if you believe one is appropriate, contact the Ethics Division at (202) 482-5384.

2002 USPTO - 2

**ETHICS GUIDANCE FOR EMPLOYEES OF THE UNITED STATES PATENT AND TRADEMARK OFFICE**

**Financial Conflicts of Interest**

<u>Interests in Patents</u> - By statute, USPTO employees are barred from applying for or acquiring a patent or any right or interest in a patent issued by USPTO. This may also preclude you from serving as a member of the board of an organization that holds interests in a patent.

<u>Conflicts of Interests regarding Patent Examiners</u> - If you are a patent examiner, you may not participate in the review of any patent if you have a financial interest in a company is a party to the patent decision (unless your interest in all parties is $15,000 or less) or if you have an interest in a company that is not a party but that may be affected by the patent decision (unless your interest in all parties and affected non-parties is $25,000). Because a patent is the grant of exclusive rights to a particular person or company with regard to a device, process, or design, any company that manufactures similar devices (or markets similar processes or similar designs), even if not a party to a patent is considered to be affected by a patent decision concerning the device (or process or design).

<u>Conflicts of Interest regarding Trademark Examiners</u> - If you are a trademark examiner, you may not participate in the review of any mark if you have a financial interest in the registration applicant regarding that mark (unless the interest is in publicly-traded stock valued at $15,000 or less in a company that is a party to the matter). Unlike with patent cases, companies that compete with each other in a particular industry sector are not presumed to have a direct interest in a trademark or service mark action of competitors.

<u>Use of Inside Information for Personal Investments</u> - As a USPTO employee, you may have access to nonpublic information; it is important that you do not use any such information when making investment decisions and that you do not disclose such information to others.

**Appearances of Bias (Non-Financial Conflicts of Interest)**

<u>Participation in Professional Organizations</u> - If you are an active member of a professional organization, such as a member of a association of attorneys or patent

## CITATIONS TO APPLICABLE LAW

**Financial Conflicts of Interest**
    18 United States Code (U.S.C.) § 208
    35 U.S.C. § 4
    5 Code of Federal Regulations (C.F.R.) §§ 2635.402-2635.403, 2635.502,
        2640.201 - 2640.202

**Appearances of Bias (Non-Financial Conflicts of Interest)**
    18 U.S.C. §§ 203, 205, and 208
    5 C.F.R. §§ 2635.501 - 2635.503

**Gifts, Bribes, and Salary Supplementation**
    5 U.S.C. §§ 5342, 5351, and 7342
    15 U.S.C. § 1522
    18 U.S.C. §§ 201 and 209
    5 C.F.R. §§ 2635.201 - 2635.205, 2635.301 - 2635-304;
    41 C.F.R. Part 304-1 and Department Administrative Order 203-9

**Outside Activities, Lobbying the Government, and Political Activities**
    18 U.S.C. §§ 203 and 205
    5 C.F.R. §§ 2635.801 - 2635.809

**Misuse of Government Position and Resources**
    18 U.S.C. § 641
    5 C.F.R. §§ 2635.701 - 2635.705

**Seeking Employment and Post Employment Restrictions**
    18 U.S.C. § 207
    35 U.S.C. § 4
    41 U.S.C. § 423
    5 C.F.R. Parts 2635 and 2637
    15 C.F.R. Part 15a
    37 C.F.R. Part 10







**ETHICS TRAINING 2002**



# CONFLICTS OF INTEREST

**Financial Conflicts of Interest**

**Appearances of Loss of Impartiality**





GX - C



## UNITED STATES PATENT AND TRADEMARK OFFICE

WASHINGTON, DC 2023
WWW.USPTO.GOV

| FORM CD-260<br>REV. 6-86<br>DAO 202-335 | **MERIT PROGRAM** | Announcement Number: | **PTO-04-078** |
|---|---|---|---|
| | | Issue Date: | **6/1/04** |
| | | Closing Date: | **6/22/04** |

# VACANCY ANNOUNCEMENT

**TITLE, SERIES, AND GRADE**
Supervisory Patent Examiner
GS-1224-15
Position is at the full performance level
Multiple positions
Competitive Service
Non Bargaining Unit
Temporary Position NTE 5 years
(May become permanent)
Selectee(s) may be required to
qualify for and hold a national
security clearance

**VACANCY LOCATION**
Patent and Trademark Office
Directors Office
Technology Center 3600

**AREA OF CONSIDERATION**
PTO Employees with Status
DOC Surplus, Displaced Employees in
local commuting area

**DUTIES:**
The incumbent serves as head of a Patent Examining Art Unit under the general administrative direction of the Group Director. Incumbent is responsible for the authoritative interpretation of legal precedents for making a wide variety of decisions involving the subject matter of Technology Center 3600: Transportation, Construction, Agriculture, National Security and License & Review. Patent applications will include subject matter that requires knowledge of nuclear engineering, chemistry and/or physics. The incumbent will be performing a number of related duties such as determining whether two or more applications contain interfering subject matter. Incumbent exercises the full range of supervisory and managerial duties associated with the direction of work in the art unit. The incumbent will also serve as a team member in providing input to the Group Director for the administration of the Invention Secrecy Act, the Atomic Energy Act and the National Aeronautics and Space Administration Act in accordance with 35 USC 181-186 and 42 USC 2181-2182, and 2457.

**SUMMARY OF QUALIFICATION REQUIREMENTS:**
Applicants must have had one year of experience which has equipped them with particular knowledge, skills, and abilities to successfully perform the duties of the position, which is typical to the work of the position to be filled, and is equivalent to the next lower grade in the Federal Service. Status applicants considered under Merit Program Procedures are subject to time-in-grade requirements in accordance with 5 CFR 300.604. CTAP/ICTAP candidates will be determined to be well qualified if they score 90 or higher when rated against the crediting plan.

**EVALUATION OF QUALIFIED CANDIDATES:**
will be on the basis of experience, training, awards, supervisory appraisals, and the following factors. **Failure to address each factor may have an impact upon your ranking.**
1. Ability to supervise and perform administrative duties, including effectively motivating, leading and training patent examiners and other employees.
2. Knowledge of the scientific and technical matters associated with the patent process in the designated art area.
3. Knowledge of legal matters associated with the patent process in the designated art area, which includes demonstrated competence in examination practice and procedure or comparable experience in the patent field.
4. Knowledge of Patent and Trademark Office strategic direction, short and long term goals, policies, and programs and their impact on the organization.
5. Ability to communicate effectively orally and in writing

**SELECTIVE FACTOR: Candidate must possess the following for consideration:**
1. Must have full signatory authority.
2. Applicant must have passed the certification examination, or have passed the agent's examination.

**HOW TO APPLY - SUBMIT THE FOLLOWING:**
Candidates may submit a SF-171, Application for Federal Employment, an OF-612 or resume.
Most recent supervisory appraisal and a recent copy of a SF-50, Notification of Personnel Action (Status Candidates Only)
3. An official letter from the USPTO verifying that you have passed the certification examination, or have passed the agent's examination.
4. Vacancy announcement number, position title must be recorded on the application submitted.
5. Statement of qualifications relating to the Selective Factor and each of the Ranking Factors.

000068

# DR. GEOFFREY ROY AKERS, P.E.

**EDUCATION:**
Bachelor of Science-Engineering Physics-University of Maine-6/68(Honors)
Master of Science-Applied Mathematics-Columbia Unkiversity-2/70(Honors)
Master of Science-Nuclear Engineering-Columbia University-6/71(Honors)
Doctor of Philosophy-Physics-Univertsity of Connecticut-5/80(Highest Hopnors)
MBA-(Management & Finance)-Renssalaer Polytechnic Institute-Troy,NY-5/80(Highest Honors)
Certificate in Advanced Business Management-Georgetown University-12/03

**LICENSES:**
RegisteredProfessional Engineer-Electrical Engineering(PE-18900-E)(PA)(1972)
NASD Principal's Licenses Series 27/53/24/4-(Financial Operations/Municipals/General Securities/Options)

**HONORS:**
National Science Foundation Fellowship at Columbia(1969)
Sigma Xi Scientific Research Honor Society(1980)
Sigma Pi Sigma Physics Honor Society(1966)
Brown Medalist(1964)
Presidential Scholar and four year Honors Program member and scholarship(1964-1968)
Who's Who in International Professional Directory(2004)
Who's Who in Entrepreneurs and Business Directory(2004)
USA Track & Field Directory(1998)-60 USA marathon medals(1985-2003)
Government and industrial sponsorships for all graduate degrees(1969-1980)

**PUBLICATIONS:**
Stanford Research Institute-Electromagnetic Wave Propagation(1970)
Wall Street Transcript-Matehmaticsal Finance(June,1999)
Wall Street Transcript-Mathematical Finance-(January,1998)
Journal of Acoustical Society of America-(JASA)-Acoustical Wave Propagation(Dec 1980)
JASA Symposia Papers-Acoustical Wave Propagation(Fall,79)(Spring,1980)(Spring,1981)
IEEE/URSI-Elecrtromagnetics/Communicationas(Fall,1987)-Scientific Conference
PIERS-Progress in Electromagnetics Research-Beijing,China(1988)
IEEE/URSI-Wave Propagation in Anisotropic Media-Ottawa,Canada(1980)

**USPTO:**
Master's Level Certification(2002)
Community Day Champion(2003)
Georgetown University Professional Certificate in Technological Art(2003)

**EXTRACURRICULAR:**
Vice-President Board of Trustees-Three Rivers Community College-Norwich,CT(1996)
USPTO EEO Board(2000)-American Indian Minority(Cherokee Heritage)

## PROFESSIONAL EXPERIENCE

A)  USPTO, Arlington,VA-(1999-Present)-Primary: I have been acting SPE in my present art unit in E-commerce. I am a primary examiner with a Master's certification in the technological art(GS-14+5 points).I examine in electrical engineering,networking and information systems,communications, computersecurity,cryptology,finance and internet technologies. I have written myriads of technical olffice actions, appeal brief rebuttals,reexaminations,conducted interviews with attornies, utilized office policy and implemented and interpreted MPEP procedures. I have assured quality in cases and reduced pendency and have delivered technological presentations at the USPTO.

  I have worked in the USPTO/EEO Board for American Indian employment practices as a Native American Indian minority myself(Cherokee).I actively encourage diversity across all racial lines and have been involved in USPTO APANET activities a lecturer.

  I always mentor and provide technical and strategic support to practitioners in my art unit(as well as others) in E-commerce,networking systems,business methods,finance,imformation systems,internet technology,digital and analog communications and cryptology. I havebeen a mentor to examiners in my TC as well as others.I am extremely resourceful and flexible and adaptable to different challenges and technologies because of my broad scientific education and management experience and education.

  I utilize Office policy in drafting actions, conducting interviews and in maintaining high production consistently each year(top 5% of primaries).I have received Outstanding ratings every year I have been at the USPTO.I hope to achieve the Bronze Medal in the foreseeable future.


B)  AMEREST CORPORATION, Dallas,TX-(1997-1999)-President-I led a company of 35 employees with annual sales of $15 million in the exploration,development and extraction of oil and natural gas for commercial delivery. I operated as a scientific and business manager of the organization in capitalizing the company interests, setting long term and short term strategic goals and acheiving milestones for being a oil producer and provider to the marketplace.I led efforts through private capital funding and provided technical expertise in seismology and geophysics to determine the most viable locations to obtain oil and gas.


C)  AT&T BELL LABORATRIES,(1992-1997)-Program Principal Staff Scientist-I was the principal scientist in the design and development of the algorithms for the Navy SDS(Surveillance Detection System) which was used by the Navy to classify and identify ocean targets. This was a $7 mil program. I supervised 4 other PHD scientists and employed a multi-computer based platform utilizing data fusion techniques.


D)  NAVAL UNDERWATER SYSTEMS CENTER,New London,CT(1990-1992)-Program Principal Scientist-I was the principal scientist/program manager for NUSC in the design and development of the AN/BSY-2 Nuclear Fast Attack SSN-21 Submarine Combat System.I managed the system software design for the ranging and bearing algorithms of the system array

and well as the fire control solution for missile launch operations. I worked closely with the prime contractor, General Electric in system design and test and integration.I chaired software design meetings for NUSC at the contract's site in the task manager post and test and operational planning sessions in the design,test and burn in of the system. I further developed the requisite reliability calculations for the combat system operational effectiveness as a guide in developing sufficient redundancy in the system MTBF to assure mission critical effectiveness. The system was delivered to NAVSEA within time and budget and quality constraints. I utilized the methods of PMBOK for program management.

E) E-SYSTEMS/RAYTHEON, Greenville,TX(1987-1990)-Deputy Director of Systems Engineering-I was the program manager in the design and development and integration of the HF/DF system used in the Ground Radio Reconnaissance System(GRRS)($68 mil program) used by the Saudi Arabian Army. I was in complete technical charge of the software development process in the design and devlopment of the direction finding algorithm and detection methods employed in locating enemy targets in OOK,FSK,USB,LSB,AM,FM modulation modes of operation.I was present at the software test and code correction as well as contributed to the coordinarted hardware design prototype building and testing and component burn in and system design and assembly.I supervised 50 hardware and software and systems engineers and scientists and programmers in the system design test and integration. I also worked in the design of field tests to ascertain and improve system accuracy as well as monitored contract progress with respect to costs and milestones met and progress on system completion.

F) RCA/GENERAL ELECTRIC, Moorestown,NJ(1983-1987)-Principal Member of the Engineering Staff-I was the program manager at General Electric in the hardware and software design of the SPY 1-A electronically steerable track while scan radar used in the AEGIS Weapons System by the Navy on CG cruisers($40 mil). I was responsible for the algorithm development for location,acquisition and track resolution as well as the design of the phasing of the elements on the radar face as well as the system test at the CSED site at RCA for system accuracy. The system was integrated at Ingalls Shipyard in Pascagoula,Mississippi on Navy cruisers and was tested through TECHEVAL and OPEVAL sea trials.During the development process, there were weekly meetings during which evaluation of progress toward WBES milestones was made.
I was also the General Electric Test Director at the ALCOR C-band tracking radar on Kwajalein,Marshall Islands at the Pacific Missile Test Range performing tracking of MX-missile shots for accuracy as fired from Vandenburg AFB, California. I worked closely with MIT/Lincoln Laborartory personnel as a collaboratorve researcher and project engineer-scientist supervising 15 scientists in the operation and upgrading of the 35-95 GHz MMW radar and the 4 GHz C-band tracking radar.

G) GENERAL INSTRUMENT CORPORATION,Westwood,Massachusetts(1980-1983)-Director of Advanced Development-I lead a team of 15 engineers($2 mil program) in the development of the SEABEAM acoustic imaging system used by the Navy and NOAA to image the ocan bottom to tactically determine where submarines hide.All software,hardware, systems design and integration responsibilities were under my cognizance and the system was delivered

1

to the customer-user(Navy) within time and operational constraints.System life cycle burn in and computational algorithm devlopment were also performed.This involved designing and testing the imaging algorithm, designing the requisite software code and integrating it onto a prototype and verifying operational accuracy.

H) NAVAL UNDERWATER SYSTEM CENTER, New London, CT-(1973-1980)-Supervisory Project Engineer-I was the project engineer in the design and development and test and integration of the AN/BRD-7(RF)(HF/DF)(2-32 MHz) system used on 637 and 688 class submarines.I was the COTR(Contracting Office Technical Representative) at the contractor's facility(Sanders-Lockheed) in the actual hardware and software design and system burn in and test for the submarine based system. I worked closely with my organization, NUSC as the technical manager to PME-107(NAVELEX) as the Program Manager in Washington.I attended design reviews,and oversaw the complete hardware,software design process of the system. I contributed to the writing of the operational and maintainance and training manuals for system operation and maintenance. The system was integrated on 637/688 class submarines in Norfolk and taken to sea on TECHEVAL and OPEVAL trials and delivered to the Navy within time and operational specifications.

I) ARMY ELECTRONICS COMMAND, Ft. Monmouth,NJ-(1968-1973)-Electromagnetic Physicist.I worked as an electromagnetic physicist required to formulate mathematical equations that describe radio wave progpagation in a forest used to improve HF communications for tactical operations in Vietnam. I also served as the on-site communications engineer in Vietnam supporting tactical field operations and providing quick-fix solutions to in field communications problems. I received the Department of the Army Special Acts Award for this service.

TEACHING AND MENTORING EXPERIENCE:

I have been an adjunct professor in mathmartics and physics at six universities including East Texas State University(1988-1989)(physics and calculus), Missisippi Gulf Coast College(1984)(mechanics), University of Charleston(1992)(physics), University of Hawaii(mathematics)(1983-1984), New Jersey Institute of Technology(graduate level numerical analysis)(1985), Connecticut College(1974)(MEDCAT mathematics/physics).I have also taught in house industrial mathematics to employees at E-Systems in corporate education(1987).

JOB RELATED COURSES: Intellectual Property Law-USPTO-2000
    -Half Year of Law School Completed(12 credits)-Temple University Law School(1999)

000033

**UNITED STATES**
**PATENT AND**
**TRADEMARK OFFICE**

Position Title: Supervisory Patent Examiner

Series-Gr: GS-1224-15

Full Performance Level: 15

Issue Date: 6/1/04

HR Specialist: KIM CABOGA

**Promotion Eligibles (Consideration Code A) - Grade 15**

Closing Date: 6/15/04

"CONSOLIDATED"

000078

5

| Name | 1. | 2. | 3. | 4. | 5. | 6. | +70 | Veteran Points | Summary Score |
|---|---|---|---|---|---|---|---|---|---|
| ERS, GEOFFREY | | | 8 | 6 | 8 | 8 | 70 | 0 | 48 |
| BAUMEISTER, BRADLEY | 25 | 15 | 8 | 8 | 8 | 8 | 70 | 0 | 61 |
| BOMBERG, KENNETH | 25 | 13 | 10 | 8 | 8 | | 70 | 0 | 64 |
| GARTENBERG, EHUD | 25 | 13 | 17 | 8 | 8 | | 70 | 0 | 69 |
| LIUU, TUYET PHUONG | 25 | 5 | 10 | 10 | 7 | | 70 | 0 | 66 |
| MYHRE, JAMES | 25 | 5 | 5 | 5 | 5 | | 70 | 0 | 38 |
| SHAH, SANJIV | 25 | 5 | 13 | 5 | 7 | | 70 | 0 | 59 |
| YAO, SAM CHUAN | 10 | 5 | 5 | 5 | 4 | | 70 | 0 | 29 |

Tom Will _(signature)_    7/9/04

Lanna Mai _(signature)_    7/9/04

Michael Carone _(signature)_    7/9/04

Raters' Signature    Date

# CREDITING PLAN
## EVALUATION FACTORS
### Supervisory Patent Examiner
### GS-1224-15

1. **Ability to supervise and perform administrative duties, including effectively motivating, leading and training patent examiners and other employees.**

## OUTSTANDING LEVEL (21-30 Points)

Experience serving as an acting SPE, project manager or team leader, or chairperson for a committee or task force.  Ability to coordinate the work of others in a supervisory setting including integrating work activities, dealing effectively with interpersonal issues, and planning and setting priorities.  Experience reviewing the work of others and providing appropriate feedback.  Ability to motivate others to achieve organizational goals.  The above supervisory experience and ability is coupled with demonstrated results which show effective application of these attributes.

Experience performing administrative duties such as telephone/furniture coordinator, PALM troubleshooter, assisting SPE in managing these activities, move coordinator, and coordinating social events.  Performance of these activities is completed in a timely manner, with a high level of accuracy, and with minimal oversight.

Demonstrated experience in group facilitation and training techniques including mentoring, coaching and counseling.  Evidence should be provided of exercising primary responsibility for training more than one junior examiner at a time.  Experience may include performance of training activities at the Patent Academy or in a Technology Center, Group, or Art Unit level setting involving a plurality of students.

The demonstrated experience may include prior work experience and other outside activities (civic, professional, associations, military, homeowners or other groups, etc.)

## HIGHLY SATISFACTORY LEVEL (11-20 Points)

Supervisory experience and demonstrated abilities with respect to the examples set forth above are evidenced and broad but only include some of the areas identified.

Performance of administrative duties is evidenced but limited in scope and/or may have been accomplished with a greater degree of oversight.

Training experience is limited to the primary responsibility for one junior examiner or training usually conducted in a small group setting.

The demonstrated experience and/or abilities may include prior work experience and other outside activities.

## SATISFACTORY (1-10 Points)

Supervisory experience and demonstrated abilities with respect to the examples set forth above are presented but are of a limited scope.

Administrative duties are performed on an occasional basis, limited in scope and require supervisory review and/or oversight.

Training experience is limited to assistance with respect to one or a small number of junior examiners.

The demonstrated experience and or/abilities may include prior work experience and other outside activities.

---

**2. Knowledge of the scientific and technical matters associated with the patent process in the designated art area.**

---

## OUTSTANDING LEVEL (11-20 Points)

Experience in designated art area providing guidance and advice on scientific or technical issues related to patent/technology matters. Recognition by others for their expertise and competency in the patent field as evidenced by participation in and/or selection to advisory groups, or

2.

000084

special assignments. Such recognition may include the completion of advanced degrees, recognition by professional organizations, serving as an expert for Master's level hearings (PTO), providing search assistance/consultation for internal and/or external customers, publication of technical articles, participation in reclassification or classification activities, serving as a conferee on appeal conferences, selection for teaching technical seminars/courses in the designated art area, and consultation with respect to technical matters by the Board of Appeals and Interferences, Solicitor's Office, etc.  Demonstrated mastery of the technological concepts and semantics of the art areas in the assigned technology.   (If the technology assigned to the Art Unit requires special technical expertise, credit should be given to actual experience in the technology and/or recognition for extra credit items under the GS-1224 Series.)

## HIGHLY SATISFACTORY LEVEL (6-10 Points)

Experience in designated art area is equivalent to that set forth above. Recognition by others is evidenced but is limited in scope.  Demonstrated knowledge of the technological concepts and semantics of the art area.  (If the technology assigned to the Art Unit requires special technical expertise, credit should be given to actual experience in the technology and/or recognition for extra credit items under the GS-1224 series.)

## SATISFACTORY LEVEL (1-5 Points)

Knowledge of the designated art area and concepts involved therein are primarily derived from work experience in related technologies rather than direct experience in the designated art area.

> **3.  Knowledge of legal matters associated with the patent process in the designated art area, which includes demonstrated competence in examination practice and procedure or comparable experience in the patent field.**

## OUTSTANDING LEVEL (11-20 Points)

Experience in legal research and writing gained from providing advice and guidance on issues related to patent/technology matters in the designated art

3.

000085

area. Such experience may include work as a Special Program Examiner, details/work assignments with the Board of Appeals and Interferences, Solicitor's Office, OLIA, etc., preparing rule revision packages, revisions for the MPEP, providing legal and/or practice and procedure training to other patent professionals, and the practice of law. Recognition by others for their experience and competency as evidenced by participation in and/or selection to advisory groups and/or special assignments. The recognition may include recognition by professional societies, awards, medals, and ratings for high quality performance, publication of legal articles, and special projects with respect to legal and/or practice and procedure issues. Remains current with respect to legal and practice and procedure issues through continuing legal education, attending legal lectures and practice and procedure updates, reviewing legal publications such as the USPQs and reviewing the MPEP revisions. Completion of advanced legal studies including law school courses and successful completion of the Bar examination.

## HIGHLY SATISFACTORY (6-10 Points)

Experience in the designated art area is equivalent to that set forth above. Recognition by others is evidenced but is limited in scope. Completion of legal studies including law school courses or PTO sponsored legal studies.

## SATISFACTORY (1-5 Points)

Maintains a current level of knowledge of patent law and/or legal issues and patent practice and procedure through the review of Patent Corps memoranda, the USPQs and other authoritative sources. All required update training is completed.

---

**4. Knowledge of Patent and Trademark Office strategic direction, short and long term goals, policies, and programs and their impact on the organization.**

---

## OUTSTANDING LEVEL (11-20 Points)

Demonstrates knowledge of PTO vision, goals, policies, programs and strategic plans and Patents Cost Center (5) goals. Regularly participates in

4.

000086

and seeks leadership roles with respect to activities to support those objectives, including recruitment of patent examiners, PTO job fairs, outreach efforts, inclusion efforts, OCR committees and celebrations, Inventor's Day, Community Day, CFC, U.S. Savings Bond Drive, Kids 'N" Chemistry, D.C. School Tutor Program, PTOs activities, etc. Taking personal actions and making efforts to actively support these objectives including cycle time reduction, productivity, customer service actions, work on business plans, and other reinvention efforts. Results from these actions and efforts provide a significant contribution to the achievement of PTO goals.

## HIGHLY SATISFACTORY LEVEL (6-10 Points)

Demonstrates knowledge of the PTO program areas listed above. Participates in the activities and makes personal efforts to support the objectives but either or both are limited in scope and usually not in a leadership role.

## SATISFACTORY LEVEL (1-5 Points)

Demonstrates knowledge of the Patents Cost Center (5) Goals. Limited participation and support for the program listed above.

## 5. Ability to communicate effectively orally and in writing.

## OUTSTANDING LEVEL (8-10 points)

Experience preparing clear and concise written communications on complex subject matter issues. Such experience may include writing submissions for the PTO Pulse, publications of work products, details or work assignments involving writing, MPEP and Form Paragraph revision work, and Law Review participation. Demonstrated ability to independently formulate complete actions or recommendations with respect to the grant or denial of a patent to an applicant. The formulated or recommended written work product rarely requires and leaves little room for improvement. Oral communications in most cases clearly and concisely present the positions taken or recommended. Provides training and guidance to junior examiners in a clear and concise manner. Experience in orally presenting

5.

complex subject matter in an effective manner, including personal and telephonic interviews with applicants, speaking assignments, participation in Toastmasters, teaching assignments, moot court participation, and making
presentations. The demonstrated experience may include prior work experience and other outside activities.

## HIGHLY SATISFACTORY LEVEL (5-7 points)

Prepares written drafts that are clear and concise and rarely require substantive revisions. The experiences evidenced are the same but are more limited in scope. Demonstrated ability to formulate appropriate action or recommendation with respect to the grant or denial of a patent to an applicant.

Oral communications are complete and accurate and clearly and concisely present the position taken or recommended. The experiences evidenced are the same but are more limited in scope. Conducts personal and telephone interviews with applicants and/or their representatives. The demonstrated experience may include prior work experience and other outside activities.

## SATISFACTORY LEVEL (1-4 Points)

Prepares effective written communications in formulating appropriate action or recommendation with respect to the grant or denial of a patent to an applicant.

Oral communications are acceptable and clear and present the position taken or recommended.

6.

*07-266
RJL*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

DR. GEOFFREY R. AKERS

**DEFENDANTS** CARLOS GUTIEREZ, SEC'TY, DOC
+
PATRICIA DYLAN, DIRECTOR/OCR/USPTO

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)    88888

Pro Se NP

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)    88888
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATI...

CASE NUMBER   1:07CV00266

*JURY ACTION*

JUDGE: Richard J. Leon

DECK TYPE: Employment Discrimination

DATE STAMP: 02/  /2007

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

◯ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENS FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☒ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other) OR** ☐ **Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

④

| □ G. *Habeas Corpus/* *2255* | □ H. *Employment Discrimination* | □ I. *FOIA/PRIVACY ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ K. *Labor/ERISA (non-employment)* | □ L. *Other Civil Rights (non-employment)* | □ M. *Contract* | □ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

| □ 1 Original Proceeding | □ 2 Removed from State Court | □ 3 Remanded from Appellate Court | □ 4 Reinstated or Reopened | □ 5 Transferred from another district (specify) | □ Multi district Litigation | □ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

TITLE VII - CIVIL RIGHTS ACT; AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 Sut 15(b)
29 CFR 1614.407 / 42 USC 2000E et seq / 29 USC 601 et seq - Fair Labor

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    □    **DEMAND $** 870,000    Check YES only if demanded in complaint    **JURY DEMAND:** □ YES    □ NO

**VIII. RELATED CASE(S) IF ANY**    p.F.    (See instruction)    □ YES    □ NO    If yes, please complete related case form.

**DATE** 2/1/07    **SIGNATURE OF ATTORNEY OF RECORD**

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

:\forms\js-44.wpd